## COMMONWEALTH vs. DANIEL KEE.

Hampden. April 6, 2007. - July 20, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Practice, Criminal,* Loss of evidence by prosecution, Instructions to jury, Argument by prosecutor. *Evidence,* Relevancy and materiality, Exculpatory.

The judge at the trial of a charge of distribution of a Class B controlled substance properly denied the defendant's motion for relief based on lost or destroyed evidence (a "marked" ten dollar bill), where the defendant did not meet his initial burden of showing a reasonable possibility that the lost evidence was exculpatory [553-555], and where the outcome would have been the same had the judge proceeded to conduct a balancing test weighing the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant [555-557]; likewise, it was not an abuse of discretion for the judge to decline to give the defendant's requested missing evidence instruction [557-558], though any such instruction in future cases should generally permit, rather than require, a negative inference against the Commonwealth [558-559].

There was no merit to a criminal defendant's contention that the prosecutor's closing statement at trial contained improper inflammatory statements [559] or statements vouching for the credibility of Commonwealth witnesses [560-561].

INDICTMENT found and returned in the Superior Court Department on May 3, 2005.

The case was tried before *Daniel A. Ford,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Jane Larmon White,* Committee for Public Counsel Services, for the defendant.

*Bethany C. Lynch,* Assistant District Attorney, for the Commonwealth.

COWIN, J. A Superior Court jury convicted the defendant, Daniel Kee, of distribution of a Class B controlled substance.[1]

---

[1] The defendant also pleaded guilty to a charge of having a previous conviction of the same offense. During trial the Commonwealth entered a nolle

On appeal, he argues that the judge's denial of his "motion for relief based on lost or destroyed evidence" (a "marked"[2] ten dollar bill) denied him due process. A related claim is that the judge improperly denied his request for a so-called "missing evidence" jury instruction (i.e., that the failure, without good explanation, to produce important evidence warrants an inference that such evidence, if produced, would have been unfavorable to the Commonwealth). Finally, the defendant maintains that the prosecutor's closing argument was improper because it contained inflammatory statements and vouched for the credibility of Commonwealth witnesses. We granted direct appellate review. We conclude that the judge committed no error and that the prosecutor's closing argument did not contain improper material, and we therefore affirm the convictions.

The essence of the case is expressed in the defendant's first two claims, which concern the "loss" of a "marked" ten dollar bill used in an undercover drug purchase in Springfield. The defendant contends that he was prejudiced by the admission of testimony concerning this money when the marked bill itself was not produced at trial, and that, even if it were permissible to admit such testimony, the judge erred in failing to give a missing evidence instruction. We conclude that there was no error.

We summarize the facts the jury permissibly could have found. On March 31, 2005, State police and Springfield officers were working as a team to arrest drug sellers in the Springfield area. Three of these officers testified: Trooper David Patterson, the team's undercover officer; Sergeant Robert Tardiff of the Springfield police, the surveillance officer; and Trooper Thomas Fitzgerald, the arresting officer. Trooper Patterson had received one hundred dollars with which he was expected to make drug purchases "all day." No photocopy of the money was made because the group of officers was working out of a new office, apart from the Springfield police station, that had no photocopier. To enable later identification of the money used in the purchases,

---

prosequi of an indictment charging the defendant with commission of a controlled substance offense while in, on, or near a school or park.

[2]The term "marked" in this context refers to a police practice of marking money before engaging in undercover work to enable the police to identify the money later.

Trooper Patterson marked the bills with a number and informed the members of the team of the symbol and its location on the bills. The number was placed so that it would be difficult for drug dealers to notice it.

Trooper Patterson was outfitted with a device that permitted the other team officers to listen to his conversations so that, should he be in any danger, they would be alerted immediately. The device did not record conversations and was used because, according to Trooper Patterson, Springfield was "a bad place" and he was concerned for his safety.

At approximately 9:40 P.M., Trooper Patterson made contact with the defendant and arranged to buy a "20," a rock of "crack" cocaine valued at twenty dollars. The trooper gave the defendant a twenty dollar bill for the purchase and an additional ten dollar bill for his services as the middleman, i.e., the person who obtained the drugs from the seller and gave them to the buyer. Both bills were marked. The defendant entered a doorway to an apartment building, leaving the trooper's presence for approximately fifteen to twenty seconds. When he returned, he handed the trooper a piece of crack cocaine. (A certificate from the Department of Public Health laboratory stated that the item Trooper Patterson received from the defendant contained cocaine.)

With the evidence in hand, the trooper gave the prearranged arrest signal to the surveillance officer, Sergeant Tardiff. As the trooper walked to his vehicle, which was parked "right there,"[3] he saw the arresting units "mov[ing] in," and watched as the defendant was placed under arrest. Trooper Patterson never lost sight of the defendant until after he was arrested. He identified the defendant in court as the man from whom he had purchased the drugs on the night in question.

Sergeant Tardiff was responsible for the safety of the undercover officer. From a distance of about fifty feet, in an unmarked vehicle, he watched the initial meeting between Trooper Patterson and the defendant. The area was "very well-lit" and he had no difficulty seeing the defendant. He kept his eyes on the officer

---

[3]Trooper Patterson testified to the vehicle's location in relation to the defendant in terms of distances between objects within the court room, but the record contains no numerical reference to that distance. It is obvious that the vehicle was close to the defendant.

and the defendant during most of the remainder of the transaction and did not "lose sight of the defendant . . . from the time [the defendant] walked back around the building with Trooper Patterson to the time he was arrested." Sergeant Tardiff identified the defendant in court as the man with whom Trooper Patterson had been interacting.

Following the arrest, a ten dollar bill marked with the number that Trooper Patterson had written on it was seized from the defendant's right pocket. This was the same pocket into which the trooper observed the defendant place the money. Trooper Fitzgerald, the arresting officer, saw another officer take a ten dollar bill from the defendant; Trooper Fitzgerald looked at the bill and saw the "marking on the back that Trooper Patterson always [uses]." (The trooper who recovered the money from the defendant's pocket did not testify.) Because the police were operating on a restricted budget, they did not retain the marked money; rather, they used it for additional drug purchases.

Based on testimony that the area was dark, with many people "milling about," and a suggestion (disputed by the Commonwealth's evidence) that the arresting officer made the arrest based only on a description that fit many of the individuals in the area (black male, in jeans, baseball cap and dark jacket), the defense argued that the police had arrested the wrong man. To buttress this contention, the defendant claimed that he did not possess the marked ten dollar bill. Cross-examination and closing argument focused on the failure of the police to photocopy or record the marked bill.

The defendant filed a motion in limine (titled a "motion for relief") to prevent the Commonwealth from introducing any evidence regarding the marked ten dollar bill. The judge denied the motion and the defendant maintains that this was an erroneous ruling.[4,5]

We have been confronted frequently with the problem of

---

[4]Before the judge, the defendant requested that the indictments be dismissed because of the lost evidence. In the alternative, he requested that all testimony regarding the marked ten dollar bill found on him at arrest be excluded from trial. In his written submissions to the judge, and on appeal, the defendant's argument is restricted to the latter remedy.

[5]The defendant did not object at trial to the admission of testimony about the ten dollar bill. The filing of a motion in limine to prevent the introduction

governmental loss of evidence that might be of some benefit to a criminal defendant. To assist, we have developed criteria for dealing with the issue of lost or destroyed evidence.

"A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden . . . to establish 'a "reasonable possibility, based on concrete evidence rather than a fertile imagination," that access to the [evidence] would have produced evidence favorable to his cause' . . . ." *Commonwealth* v. *Dinkins*, 440 Mass. 715, 717 (2004), quoting *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). That is, the defendant must establish a reasonable possibility that the lost or destroyed evidence was in fact exculpatory. *Commonwealth* v. *Kater*, 432 Mass. 404, 418 (2000). If a defendant meets this burden, the court proceeds to a balancing test and "weigh[s] the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). In the balancing process, the Commonwealth is considered culpable if the evidence has been lost or destroyed through its inadvertence or negligence. *Commonwealth* v. *Harwood*, 432 Mass. 290, 295 (2000). Evidence is considered material in this context if, "in considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise exist." *Commonwealth* v. *Otsuki*, 411 Mass. 218, 231 (1991). Prejudice in this equation has not been defined in our cases any more specifically than an inquiry whether access to the missing item would have aided the defendant's case. See, e.g., *Commonwealth* v. *Cintron*, 438 Mass. 779, 785 (2003). In reviewing the denial of a motion based on the Commonwealth's loss of allegedly exculpatory evidence, we do not disturb the judge's decision absent a clear abuse of discretion. *Id.* at 784.

Our cases have consistently required that, before the balancing test is undertaken, the defendant must meet his initial burden of showing a reasonable possibility that the lost evidence was exculpatory. See *Commonwealth* v. *Laguer*, 448 Mass. 585, 595

of evidence does not, by itself, protect appellate rights. See *Commonwealth* v. *Shea*, 401 Mass. 731, 740 (1988). Here, the defendant objected to the denial of his motion and the judge stated, "Your objection's noted, and your rights are saved." We construe the judge's comment as relieving the defendant of the necessity to object to the evidence at trial.

(2007) (affirming denial of motion for new trial due to failure to disclose fingerprint report; absence of defendant's fingerprints at crime scene not exculpatory as defendant was aware Commonwealth could not place him in victim's apartment by means of any physical evidence); *Commonwealth* v. *Dinkins, supra* at 718 (affirming denial of motion to suppress due to inadequate showing that access to lost gun and shell casings "would have helped rather than hurt his cause"); *Commonwealth* v. *O'Day*, 440 Mass. 296, 307 (2003) (affirming denial of motion to dismiss due to inadequate showing that Commonwealth's intentional destruction of infernal device denied defendant access to exculpatory evidence); *Commonwealth* v. *Cintron, supra* at 785 (affirming denial of motion to dismiss or suppress due to defendant's failure to show that access to original fingerprint would have provided evidence more favorable than photographs of fingerprint). Here, the defendant presented no evidence that production of the missing ten dollar bill would have benefited him. A claim that the evidence "could have" exonerated him is speculative at best and is not the equivalent of "concrete evidence." *Commonwealth* v. *Dinkins, supra*. The judge did not abuse his discretion in denying the defendant's motion for relief based on lost or destroyed evidence.

Even had the judge proceeded to conduct a balancing test, weighing the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant, the defendant would fare no better. Clearly, the Commonwealth was responsible for the loss of the marked money and took no steps to record it. The money was also material; testimony about it corroborated the officers' identification of the defendant, whereas the absence of a marking on the bill found on the defendant might have caused a question about that identification, thereby creating a reasonable doubt. Nevertheless, in the over-all balancing test, the defendant fails on the third prong: he suffered little or no potential prejudice from the absence of the money.

The missing money was a major theme of the defendant's case. In his opening statement, defense counsel asked the jurors to "focus on what happened to that money. Where is that money?" The defendant's counsel ably cross-examined all the Com-

monwealth's witnesses regarding the absence of the ten dollar bill and the failure to record its existence in any way. In a transcript of only eighty-seven pages of testimony, cross-examination on the subject of the missing money and the failure of the police to record it in any manner extended for almost twenty pages, more than twenty per cent of the total trial testimony.[6] The officers were asked repeatedly whether the money was photocopied originally and whether it was standard police practice to do so. They were also interrogated regarding whether the presence of the marked bill on the defendant was noted during the booking process. In addition, cross-examination established that the normal practice of the Springfield police (with whom the State police were engaged in this drug operation) was to photocopy drug purchase money before it was used and that the Springfield police department had a photocopy machine that the State police could have used on the night in question. Again, in closing argument, defense counsel asked, "where's the money." Given the fact that there were three police identification eyewitnesses, the absence of the money provided the strongest part of the defendant's case.

Although the defendant casts his argument in terms of the loss of exculpatory evidence, the significance of the absence of the marked bill is in fact only a challenge to the credibility of the police witnesses. An officer testified that the money was found on the defendant. Other officers explained that the police had to use that bill for additional drug purchases, and thus, the bill was no longer in the possession of the police. Whether this testimony was believed by the jury is a credibility question. The defendant contends, however, that the bill is important in and of itself, and that the failure to produce it is exculpatory. We fail to understand why that is so. It is undisputed that the police marked a number of ten dollar bills on that particular night. Had the police produced a properly marked ten dollar bill at trial (or in discovery), whether said bill was the precise bill that was

---

[6]At oral argument before this court, counsel for the defendant claimed that the defendant was "cut off" from cross-examination on the subject. The judge prevented further exploration on the issue only at the end of the cross-examination of Trooper Fitzgerald, the third officer to testify and be cross-examined on that subject. Indeed, the judge commented at one point, "you have established over and over and over again they don't have the money. . . . I think the jury has gotten the point. They don't have the money."

discovered on the defendant would have remained an open issue. With or without the marked bill, the jury would have had to evaluate the police testimony. Given the police practice of reusing the money in undercover drug purchases, even a paper record of the money found on the defendant would have presented a question of police believability.

The defendant makes an additional claim that the judge erred in refusing to give his requested instruction that, if the Commonwealth failed without good explanation to produce evidence of "importance to the case," the jury could "infer that [the] evidence . . . would have been unfavorable to the Commonwealth." The defendant contends that missing evidence can be a missing witness *or* a missing piece of physical evidence, and therefore patterned his requested missing evidence instruction on the missing witness instruction. He argues that we should apply the same analysis.

We have not directly addressed the issue of a missing evidence instruction.[7] However, "[o]ur courts have fashioned or upheld various judicial remedies for the loss of evidence," *Commonwealth* v. *Harwood*, 432 Mass. 290, 302 (2000), and "we leave it to the trial judge to determine in the first instance the remedy to be applied if . . . some sanction is required." *Commonwealth* v. *Willie, supra* at 434. In certain cases where evidence has been lost or destroyed, it may be appropriate to instruct the jury that they may, but need not, draw an inference against the Commonwealth.[8] Before such an instruction is given, the defendant must meet his initial burden of establishing a " 'reasonable possibility, based on concrete evidence rather than

[7]In *Commonwealth* v. *Phoenix*, 409 Mass. 408, 415 n.3 (1991), in dictum, we stated that "the defendant may have been entitled to an instruction that the jury may draw an adverse inference from the loss of [the evidence]." Similarly, a number of other jurisdictions have held that a "missing evidence" instruction may be appropriate in some cases. See, e.g., *United States* v. *Rose*, 104 F.3d 1408, 1417 (1st Cir.), cert. denied, 520 U.S. 1258 (1997); *Lunnon* v. *State*, 710 A.2d 197, 199 (Del. 1998); *Tyer* v. *United States*, 912 A.2d 1150, 1164 (D.C. 2006); *Estep* v. *Commonwealth*, 64 S.W.3d 805, 809-810 (Ky. 2002); *State* v. *Laurent*, 144 N.H. 517, 522-523 (1999). Cf. *Lowry* v. *State*, 363 Md. 357, 373-375 (2001) (missing evidence instruction "generally" need not be given; it is usually sufficient to allow defendant to argue for negative inference against government regarding missing evidence during closing).

[8]Of course, where the evidence so justifies, the defendant is free to argue to the jury that the police investigation was inadequate and created a reasonable

a fertile imagination,' that access to [the evidence] would have produced evidence favorable to his cause," *Commonwealth* v. *Kater*, 432 Mass. 404, 418 (2000), quoting *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984), i.e., that the lost or destroyed evidence was exculpatory. If the defendant meets this burden, the court must "weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Willie, supra* at 432. We review the judge's decision as to the appropriate remedy for abuse of discretion. *Commonwealth* v. *Harwood, supra* at 302. Here, for the same reasons that there was no error in refusing to exclude evidence regarding the ten dollar bill, see discussion *supra*, it was not an abuse of discretion to refuse to give the defendant's requested missing evidence instruction.[9,10]

By way of guidance for future cases, when it is determined that it is appropriate to give a missing evidence instruction, such instruction should generally permit, rather than require, a negative inference against the Commonwealth. See McCormick, Evidence § 264, at 225 (6th ed. 2006). See *Davis* v. *United States*, 641 A.2d 484, 493-494 (D.C. 1994), cert. denied, 514 U.S. 1028 (1995); *Estep* v. *Commonwealth*, 64 S.W.3d 805, 808-809 (Ky. 2002); *State* v. *Laurent*, 144 N.H. 517, 522 (1999). Cf. *Lunnon* v. *State*, 710 A.2d 197, 199 & n.6 (Del. 1998) (requiring inference). It may be possible to draw more than one inference from the circumstances warranting the missing evidence instruction, *Lowry* v. *State*, 363 Md. 357, 374 (2001), and choosing between competing inferences is the province of

---

doubt as to the defendant's guilt. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 486 (1980).

[9]*Commonwealth* v. *DiGiambattista*, 442 Mass. 423 (2004), cited by the defendant in a footnote, is inapposite. There, we held that, where the Commonwealth presents evidence of a defendant's confession without introducing an electronic recording of the interrogation, the defendant is entitled, upon request, to a cautionary instruction. *Id.* at 446-448. However, while the requirement was created pursuant to our supervisory powers only, that case has its genesis in the constitutional privilege against self-incrimination, see Fifth Amendment to the United States Constitution, and art. 12 of the Massachusetts Declaration of Rights. The considerations relevant to a missing evidence instruction, by contrast, do not implicate the privilege against self-incrimination.

[10]We decline the defendant's invitation to apply the spoliation doctrine, see *Fletcher* v. *Dorchester Mut. Ins. Co.*, 437 Mass. 544, 547-553 (2002), in a criminal context.

the jury, see *Commonwealth* v. *Sneed,* 376 Mass. 867, 870 (1978).

The defendant's final contention concerns the prosecutor's closing argument. He maintains that the prosecutor improperly inflamed the emotions of the jury by describing Springfield as a "dangerous" place and by stating that the lives and safety of the police were at risk. He also alleges that the prosecutor improperly vouched for and "bolstered" the credibility of the police witnesses by emphasizing their experience. Each argument was proper and supported by the evidence.[11] See *Commonwealth* v. *Viriyahiranpaiboon,* 412 Mass. 224, 231 (1992).

Trooper Patterson testified at one point that "Springfield's a pretty bad place." The prosecutor's substitution of the word "dangerous" for "bad" did not change the meaning of the trooper's statement and was permissible. The defendant also maintains that the prosecutor improperly emphasized the risk to the lives and safety of the police in an effort to sway the emotions of the jurors. The specific words the defendant criticizes are "they can wear a device so if the guy's about to die, he can call for help. That little bit they gave him. That's what they're up against, that little bit." Again, the argument was firmly rooted in the evidence. (Trooper Patterson testified: "I taped [the wiring device] to my body where I secreted [it] so that all the officers around me can listen . . . . It's for officer safety. So if he starts attacking me or if I get shot or stabbed, they'll know.") In addition, the reference to the recording was justified as rebuttal to the defense suggestion during trial that the police should have recorded the drug transaction. The criticized words were part of an explanation (supported by trial testimony) that the police cannot record a conversation without a warrant; all they can do is "wear a device so if the guy's about to die, he can call for help." In context, there was no impropriety.

---

[11]At trial, the defendant objected to the remark regarding Springfield being a "dangerous" place and the statements about the credibility of the police. When there is an objection, if the argument is improper, we review under the prejudicial error standard. See *Commonwealth* v. *Loguidice,* 420 Mass. 453, 455-456 (1995). There was no objection to the reference to the risk to the lives and safety of the police. In such case, we review to determine whether the argument, if improper, created a substantial risk of a miscarriage of justice. *Id.* Because the statements were not improper, we do not reach the issue of which standard to apply.

The defendant maintains that the prosecutor improperly vouched for the experience of the police in order to combat the defense allegation of inadequate police procedure. The remarks were supported by the evidence. The officers each had at least ten years' experience as police officers and each frequently worked on undercover drug operations. "The credibility of witnesses is obviously a proper subject of comment. Police witnesses are no exception." *Commonwealth* v. *Murchison*, 418 Mass. 58, 60 (1994). The statements also were "within the prosecutor's right of retaliatory reply," see *Commonwealth* v. *LeFave*, 407 Mass. 927, 939 (1990), quoting *Commonwealth* v. *Prendergast*, 385 Mass. 625, 633 (1982), for they were made in response to the defendant's argument that the police witnesses should not be believed. See *Commonwealth* v. *Chavis*, 415 Mass. 703, 714 (1993) ("the prosecutor legitimately could defend the credibility of [the police officer] by arguing, based on the evidence, that contrary to defense counsel's assertion [the officer] told the truth").

Furthermore, the statements did not constitute improper vouching for the credibility of the police witnesses. Improper vouching occurs if "an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury." *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004), quoting *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998). Examples of such improper vouching are references to an expert witness as "the best there is," *Commonwealth* v. *Freeman*, 430 Mass. 111, 119 (1999), or a description of a witness as "one of the most truthful, sincere, candid witnesses that I have seen in any courtroom," *Commonwealth* v. *Nicholson*, 20 Mass. App. Ct. 9, 17 (1985). The prosecutor here did not express a personal belief in the credibility of the police witnesses or indicate any personal knowledge supporting the witnesses' credibility. The argument was proper.

In addition, we recognize that jury instructions may mitigate any prejudice inherent in closing arguments. In this case, the judge instructed the jury to disregard "[e]motion or sympathy" for either side and confine their deliberations "to the evidence and nothing but the evidence." He reminded them that the arguments were not evidence and later repeated, "We all expect an

impartial verdict without sympathy or prejudice. All that we want is a verdict dictated by your logic, without sympathy for anybody, because emotions have no place in these proceedings. We're looking for impartial judgment dictated by your reasoning . . . ." We have no reason to conclude that an impartial judgment was not delivered.

*Judgment affirmed.*