NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11176

COMMONWEALTH vs. CHRISTIAN MULLER.

Worcester.     December 9, 2016. - July 11, 2017.

Present: Gants, C.J., Lenk, Hines, & Gaziano, JJ.

Homicide. Armed Assault with Intent to Murder. Armed Home
     Invasion. Firearms. Mental Impairment. Insanity.
     Intoxication. Evidence, Insanity, Intoxication. Practice,
     Criminal, Capital case, Instructions to jury, Argument by
     prosecutor.

Indictments found and returned in the Superior Court
Department on August 23, 2007.

The cases were tried before Richard T. Tucker, J.


Deirdre L. Thurber for the defendant.
Susan M. Oftring, Assistant District Attorney, for the
Commonwealth.


HINES, J.  During an armed home invasion of an apartment in

Dudley, the defendant, Christian Muller, and an accomplice[1] shot

and killed two of the occupants and critically wounded a third.

---

[1] According to the Commonwealth, the accomplice ultimately
pleaded guilty to several charges.

After a jury trial, the defendant was convicted of two counts of murder in the first degree, on the theories of deliberate premeditation and felony-murder,[2] armed assault with intent to murder, armed home invasion and unlawful possession of a firearm.

At trial, the defendant admitted that he had shot the victims; his primary defense was that he lacked criminal responsibility because of mental illness and cocaine addiction. On appeal, the defendant argues that (1) the jury instruction on criminal responsibility and voluntary intoxication was erroneous because it failed to comply with Commonwealth v. Berry, 457 Mass. 602 (2010), S.C., 466 Mass. 763 (2014), and Commonwealth v. DiPadova, 460 Mass. 424 (2011); (2) certain of the other jury instructions were fatally flawed; and (3) the prosecutor's closing argument was improper. We affirm the convictions and decline to grant relief pursuant to G. L. c. 278, § 33E.

Background. 1. The trial. We summarize the facts as the jury could have found them, reserving additional details for later discussion.

a. The Commonwealth's case. On the evening of July 8, 2007, Joanne Mercier was in her bedroom in the third-floor apartment that she shared with her brother, Aaron Bash, in

---

[2] The predicate felony for Muller's convictions of felony-murder in the first degree was armed home invasion.

Dudley.  Bash was asleep in his bedroom and their friend, Denise Johnston, was sleeping on a sofa in the living room.  Shortly after midnight on July 9, the defendant and Marc Letang kicked down the back door and entered the apartment with their guns drawn.[3]  The men walked through the kitchen and entered Mercier's bedroom, asking where Bash was.  After Mercier told them that Bash was asleep in his bedroom, the men left Mercier's room and awoke Bash.  As Mercier followed the men into Bash's bedroom, she heard the defendant asking Bash whether he was sleeping with the defendant's wife.  Bash denied the accusation.

Letang went into the living room and brought Johnston into Bash's bedroom at the defendant's request.  The defendant was at the foot of the bed facing the victims, who were all sitting on the bed, while Letang stood in the corner of the room.  The defendant continued to accuse Bash of sleeping with his wife and Bash repeatedly denied it, stating that he would not do that to his friend.  Finally, the defendant told Bash that if he just admitted it and told the defendant what he wanted to hear, this would all be over.  When Bash refused to admit to the defendant's accusations, the defendant said, "Fuck this," and

---

[3] Earlier in the evening of July 8, 2007, the defendant attempted to gain entry into Aaron Bash and Joanne Mercier's apartment, looking for Bash.  The defendant was banging on the door and calling Bash's name; Bash told Mercier not to answer the door, and eventually the defendant left without further incident.

shot Johnston in the head. As Bash asked the defendant, "What the eff are you doing?" the defendant shot Mercier in the head. When Mercier regained consciousness a few minutes later, she realized that the defendant and Letang were gone, and discovered that Johnston was still breathing despite the gunshot to her head.

Mercier had not yet comprehended that she had been shot, but knew she needed to call an ambulance for Johnston. She retrieved her cellular telephone and then called to Bash. When Bash failed to answer her, she looked him and saw that he had been fatally shot in the head. Mercier was so distraught that she had to telephone 911 twice because, at first, she could not remember where she was.

Shortly after midnight on July 9, 2007, a patron was leaving a nearby bar when he heard five to seven loud noises he assumed were fireworks. Approximately one minute later, he observed two men, whom he was able to describe, running around the corner; one of the men was carrying a firearm. The witness heard someone say, "Go. Let's go," as the men got into a vehicle and drove away.

When officers entered the apartment, they observed Mercier conscious and bleeding from her head. She was in shock, crying and "yelling things," but was able to communicate that "Christian" shot her.

Officers then discovered Bash and Johnston. Bash was found on the bed; he was dead from two gunshot wounds to his head. Johnston was found near the end of the bed, but she appeared to be alive. She later died at a hospital of a gunshot wound to her head.

Right before the shootings, the defendant and Letang had been at the home of a friend of the defendant, who lived in Webster; a woman and a man were also there. Both the woman and the defendant had been smoking "crack" cocaine. The woman testified that the more "crack" the defendant smoked, the more "crazy" he became. The defendant was agitated; he was pacing back and forth, waving his gun around, saying that he was going to put bullets in their heads. He also said that Bash owed him money for drugs and that Mercier was "just a stupid bitch."[4] Prior to leaving the house, the defendant said he was going to "take care of some business" and left with his firearm.

The defendant and Letang returned to the friend's home. They came running up the stairs, saying that they had just murdered some people. The defendant and Letang told the woman that if she said anything about their involvement in the murders that they would "put a cap in her head." There was discussion

---

[4] Until one week prior to the shootings, the defendant and Mercier had been in a short romantic relationship outside the defendant's marriage. Mercier ended the relationship because the defendant became angry with her; when she left in a vehicle without him, he fired a gun at the vehicle.

about killing the woman because she knew and had seen too much. The defendant eventually went outside the house and demanded that the woman join him. He was pacing in the road with his firearm, telling the woman both that he did not mean to do it and that he did not commit the murders. Ultimately, however, the defendant told her that he "shot the motherfucker," referring to Bash, and that he put the three victims on the bed and shot them execution style. He put the gun to the woman's head several times, threatening to shoot her in the head if she said anything about his involvement in the murders.

The woman and the defendant walked down the street where the defendant stopped to hide his gun, which the defense stipulated was used to shoot the victims, in the cellar of a home. He warned the woman not to tell anyone where he hid the gun. Next, they walked to the defendant's parents' home, where he changed out of his bloody clothing. Finally, they walked through town and ended up back at the friend's home where they slept until later that morning.

When they woke up, the police had the house surrounded. The defendant got up, saying, "I didn't do it," as he left the house and ran into some woods behind the home, where he was arrested.

The defendant was interviewed by two State police troopers at the Dudley police department. Although the defendant

initially declined to speak with the officers, after he spoke to his wife and mother, he agreed to the interview.  The defendant admitted that he was in Webster the night before and "smoked a bunch of crack," but initially denied seeing Bash.

However, after the defendant figured out that Mercier had survived and was told that the police had found his gun, he admitted to committing the shootings and stated that he knew he was going to jail.  The defendant stated that he had been doing a lot of drugs that night, and after "the gun went off" and he shot Johnston, he thought, "If I leave them alive, I'm going to jail for my life, so I [shot Bash and Mercier]."

He also told the officers, "When I'm on drugs, I see . . . lots of things.  I get real crazy.  I hallucinate . . . I have psych attacks.  I get rages.  I am a different total person." The defendant told the officers that he was off his medications and that he was bipolar and schizophrenic, had anxiety, and suffered from panic attacks and paranoia.  He also noted that when he is off his medication, he gets even more paranoid and goes "cuckoo."

b.  The defendant's case.  The defendant offered five witnesses in support of his lack of criminal responsibility defense, including three expert witnesses.

i.  Dr. Giulia Mezzacappa.  Mezzacappa, a clinical psychiatrist, evaluated the defendant at an organization

providing mental health services, in February and June, 2006, one year before the murders.[5] As part of her psychiatric evaluation of the defendant, Mezzacappa also interviewed the defendant's family, including his wife, sister, stepfather, and mother. Based on Mezzacappa's evaluation of the defendant and interviews with his family, Mezzacappa diagnosed the defendant with schizoaffective disorder.[6] At the time of Mezzacappa's February, 2006, evaluation, the defendant had stopped taking his prescribed antipsychotic and anxiety medications. As a result of her evaluation, Mezzacappa prescribed an antipsychotic mood stabilizer. During his evaluations, the defendant and his family freely reported the defendant's use of heroin, marijuana, and "crack" cocaine.

Mezzacappa opined that "substance abuse can definitely worsen any mental illness, especially a psychotic disorder or mood disorder," and agreed that drug usage can also trigger

---

[5] Dr. Giulia Mezzacappa estimated that she saw the defendant no more than three times in 2006, for a total of approximately two to two and one-half hours.

[6] Mezzacappa defined schizoaffective disorder as "a chronic mental illness that's characterized by recurrent episodes of affective symptoms, either depression or mania or a mixed state, and chronic psychotic symptoms, like hallucination, delusional ideation, or thought disorder." She further defined psychotic symptoms as "hallucination, abnormal perception, sensory perception, that don't correspond to reality, such as hearing voices or seeing things that are not there, or physical sensation that is not related to anything realistic. There is an ideation or fixed beliefs that don't correspond to reality."

psychotic effects in an individual suffering from a mental disease or defect. She noted that she had no reason to believe that the defendant was exaggerating his symptoms or malingering, especially where his family also supported his history. Nonetheless, she did believe that the defendant was aware of the effect drugs like cocaine and heroin had on him, although she could not opine as to the degree of his knowledge. Finally, Mezzacappa had no opinion as to whether the defendant was criminally responsible for his actions at the time of the murders.

ii. Dr. Hanya Bluestone. Bluestone, a forensic psychologist employed by the courts, evaluated the defendant's competence to stand trial and criminal responsibility, pursuant to G. L. c. 123, § 15 (a), on July 10, 2007. In order to evaluate the defendant's competence and criminal responsibility, Bluestone spoke with the defendant and reviewed his court clinic file, which contained a prior competency evaluation conducted by a colleague of Bluestone's, an evaluation regarding the defendant's need for involuntary commitment for substance abuse treatment in 2006, and the police report for killings. She also spoke with Mezzacappa regarding the defendant's psychiatric treatment in 2006.

During Bluestone's evaluation, the defendant had some difficulty recalling dates and placing events in time, and he

expressed some paranoia and persecutory ideation.  Bluestone was concerned about psychotic symptoms the defendant reported, especially command auditory hallucinations, which he said commanded him to commit violent acts.  She also noted that the defendant's psychotic symptoms were consistent with his prior evaluations.  She could not, however, determine the etiology of the defendant's psychotic symptoms -- whether those symptoms were primarily related to a mental illness or to the defendant's ongoing and varied substance abuse -- because his symptoms were consistent with mental illness and substance abuse and withdrawal from substance abuse.  Bluestone concluded that based on the defendant's symptoms during her evaluation alone, he should be further evaluated in Bridgewater State Hospital (Bridgewater).[7]  She did not offer an opinion regarding the defendant's criminal responsibility.

iii.  Dr. Paul A. Spiers.  Spiers, a neuropsychologist,[8] evaluated the defendant for his competence to stand trial and

---

[7] Dr. Hanya Bluestone interviewed the defendant for approximately forty minutes, and she spent an additional eight hours preparing his competency evaluation.  In addition to her interview with the defendant, Bluestone also spoke with the defendant's wife, who reported that when the defendant was using illicit drugs, his mental illness would get out of control and he would emotionally and physically abuse her.  His wife opined that the defendant used illicit drugs to manage the symptoms of his mental illness.

[8] Dr. Paul A. Spiers defined "neuropsychology" as "an investigation of the relationship between the brain and

criminal responsibility in April, 2009.[9]  In preparation for his evaluation of the defendant, Spiers reviewed the defendant's records from the Department of Youth Services and the Department of Social Services, school records, prior psychiatric treatment notes, and records from the defendant's prior incarcerations. He also reviewed expert reports regarding the defendant's competence and criminal responsibility created for the trial, including reports from Bridgewater and a corresponding evaluation from a clinical psychologist on staff at Bridgewater, and the videotape of the defendant's interview with the State police.  He also administered neuropsychological tests to determine whether the defendant's neuropsychological functioning was appropriate.

Spiers determined that the defendant was deficient in many critical areas, such as reading ability and vocabulary, which invalidated some of the testing results, because of the danger of false positive results.  Specifically, Spiers noted that tests, such as the Minnesota Multiphasic Personality Inventory (MMPI), were inappropriate for the defendant, because it required the test-taker to possess a seventh or eighth grade

---

behavior. . . . [the brain is] responsible for all our interactions with the world around us.  It's responsible for all of our behavior, and it's responsible for how we understand and control our behavior."

[9] Spiers met with the defendant once, for two or three hours in April, 2009, to conduct his evaluation.

reading level, which the defendant did not have.  Spiers further noted that the MMPI is made up of 560 true or false questions, which help evaluators not only to diagnose psychological disorders but also to gauge effort and malingering, based on how the test-taker answered the questions.  The defendant had been evaluated previously using the MMPI and other tests, the results of which led another psychologist to conclude that the defendant was a malingerer and that he exaggerated his symptoms at Bridgewater in 2007.  Spiers noted, however, that although he agreed with the methodology of the defendant's previous testing, he took issue with the conclusions regarding that testing because of the defendant's intellectual limitations.

Spiers concluded that the defendant showed evidence of defective functioning in the left frontal lobe of his brain,[10] such that he would experience difficulty with reasoning and controlling his behavior.  In Spiers's opinion, the defendant continues to have the neurodevelopmental deficits he had as a child and young adult, including oppositional defiant disorder and attention deficit disorder.  As a result of the defendant's neurodevelopmental deficits, mental illness, and his drug intoxication, Spiers opined that at the time of the shootings,

---

[10] Spiers concluded that the defendant had defective functioning in the frontal lobe of his brain, but Spiers did not have the benefit of functional magnetic resonance imaging of the defendant's brain in aid of his diagnosis.

the defendant was unable to conform his behavior to the requirements of the law, and thus was not criminally responsible.[11]  Spiers further opined that it was highly probable that because of the defendant's mental illness, the defendant could not form the specific intent to commit murder under theories of premeditation or extreme atrocity or cruelty, or to commit an assault with intent to murder.

   iv.  <u>The defendant's family</u>.  The defendant's wife and his cousin testified regarding their experiences with the defendant's mental illness and drug addiction.  The defendant's wife testified that in 2007, the defendant was receiving Social Security disability benefits for his mental disabilities.  She described the defendant as very mean, angry, and abusive when he was using drugs[12] and stated that he did not take his prescription medications when he consumed illegal drugs.  His wife said that the defendant was taking heroin, "crack" cocaine, and pills, such as OxyContin, Percocet, and Vicodin.  Two weeks prior to the shootings, his wife barred the defendant from the family home because he was consuming a large amount of illegal

---

[11] Spiers opined that at the time of the shootings, the defendant had substantial capacity to appreciate the wrongfulness of his conduct.

[12] The defendant's wife testified, however, that when the defendant was on his medication and not taking illegal drugs he was a good father and would participate fully in taking care of their children and the household, and maintained a close relationship with their extended families.

drugs and was accusing her of cheating on him.[13]  The defendant attempted to come back home five or six times during the two-week period, but she refused unless the defendant sought help for his drug addiction.  The defendant's wife also stated that on four or five occasions throughout their marriage, she observed the defendant talking to himself and when she asked who he was talking to, he answered, "his friends," although no one else was present; this occurred whether or not he was on medication.

The defendant's cousin testified that the defendant began exhibiting symptoms of mental illness after his father died when the defendant was twelve or thirteen years of age.  He became untrusting and had behavior issues.  The defendant began to use illegal drugs during this time period as well.  Approximately one or two days before the shootings, the defendant visited his cousin, who testified that the defendant was "binging" drugs and that the defendant told him that he had not slept or eaten in days.  His cousin fed the defendant and noted that he was having a conversation with himself.  His cousin had observed similar behavior from the defendant on countless occasions since their teenage years.

---

[13] In 2006, the defendant was admitted to a substance abuse treatment center after his wife filed a petition to have him involuntarily committed pursuant to G. L. c. 123, § 35.  He had been previously treated for substance abuse at other in-patient facilities without sustained success.

In his cousin's opinion, there was a drastic difference in the defendant's personality when he was taking his antipsychotic medications and off illegal drugs.  The defendant appeared to be unstable while using drugs.  The defendant's cousin also stated that the defendant did not seem to remember what he did when he was abusing drugs, and his cousin would have to recount the defendant's activities to him.  Finally, his cousin stated that while on drugs, the defendant held objectively untrue beliefs about those close to him, especially his wife.

c.  The Commonwealth's rebuttal expert.  Dr. Karin Towers, a forensic psychologist and attorney, first evaluated the defendant in July and August, 2007, for competency to stand trial and criminal responsibility, during his forty-day hospitalization at Bridgewater, and again during the summer of 2010 for the purposes of a criminal responsibility evaluation. During his hospitalization at Bridgewater in 2007, Towers and other staff members administered psychological tests to the defendant.  Towers deemed the defendant's MMPI and Structured Interview of Reported Symptoms test results invalid because his answers demonstrated that he was malingering and exaggerating symptoms.  Observations from Towers and other staff members confirmed the test results.[14]

---

[14] During the defendant's forty-day hospitalization at Bridgewater State Hospital, he admitted to making an insincere

Towers concluded that the defendant's answers demonstrated an unsophisticated attempt to appear to have more symptoms than he was genuinely experiencing. She was unable to make a definitive mental illness diagnosis because of the defendant's exaggerated or feigned symptoms and his lengthy history of illegal drug abuse. She stated that, in these circumstances, it can be more difficult to assess whether a patient actually has a mental illness, whether the symptoms are caused by illegal drug use, or whether there is an underlying mental illness that has been triggered or exacerbated by the drug use.

After viewing the videotape of the defendant's police interview, Towers concluded that the defendant exhibited volitional behavior, meaning that the defendant was aware of his surroundings and circumstances, was able to advocate for himself, and could assert his wishes. Towers opined that the defendant clearly met the criteria for antisocial personality disorder and that he very likely had some sort of psychotic disorder, or substance abuse-induced psychotic disorder. Towers further opined that the defendant was criminally responsible for his acts on July 8-9, 2007, despite the fact that he was likely experiencing psychological symptoms, because his symptoms did

suicidal gesture because he was unhappy with the medications prescribed by his treating psychiatrist. Additionally, Towers and other staff members interpreted his behavior, in which he grossly exaggerated his symptoms, as drug-seeking behavior.

not interfere with his ability to either appreciate the wrongfulness of his conduct or to conform his behavior to the requirements of the law.[15]

2. Discussion. On appeal, the defendant (1) challenges the jury instructions on criminal responsibility as inconsistent with the law governing the interplay between mental illness and the voluntary consumption of drugs or alcohol; (2) argues that certain of the other jury instructions were flawed; (3) contends that the Commonwealth's closing argument was improper; and (4) requests that we exercise our power pursuant to G. L. c. 278, § 33E, to reverse his convictions and either order a new trial or enter judgments of not guilty by reason of lack of criminal responsibility. We address each argument in turn.

a. Criminal responsibility and voluntary intoxication instructions. The defendant argues that the judge's instructions on criminal responsibility were erroneous in failing to comport with Berry and DiPadova.[16] Although the

---

[15] Towers noted a number of factors that were significant in rendering her opinion regarding the defendant's ability to conform his conduct to the requirements of the law. He decided to shoot Bash and Mercier, after he initially shot Johnston, to avoid leaving witnesses; he was able to control his behavior, such as when he left the scene of the crime; and he acted to avoid apprehension in threatening the woman who was at his friend's house, hiding the gun, and changing his clothing.

[16] The defendant is entitled to the benefit of Commonwealth v. Berry, 457 Mass. 602 (2010), S.C., 466 Mass. 763 (2014); and Commonwealth v. DiPadova, 460 Mass. 424 (2011), because his

defendant's challenge to this aspect of the jury instructions lacks precision, it appears to be based on a claim that the judge erroneously charged the jury to consider whether the defense of lack of criminal responsibility was vitiated by the defendant's knowledge that his voluntary consumption of drugs or alcohol would activate a "latent" mental disease or defect. We discern no error in the instructions on that ground. We conclude, however, that the judge's instructions were erroneous in failing to clarify, as required in Berry, that the voluntary consumption of drugs or alcohol does not preclude the defense of lack of criminal responsibility where the mental disease or defect, standing alone, causes the defendant to lose the substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Berry, 457 Mass. at 618. Notwithstanding the error, reversal is not required.

We briefly summarize the governing principles of law as background for our analysis of the defendant's claims of error. In Commonwealth v. McHoul, 352 Mass. 544 (1967), we established the basic principle of law for determining criminal responsibility. We held that a defendant is not criminally

---

trial commenced approximately seven months after Berry was released, and his direct appeal was pending when DiPadova was released. See Commonwealth v. Johnston, 467 Mass. 674, 704 (2014).

responsible for his actions if, as a result of a mental disease or defect, he lacked the substantial capacity to appreciate the wrongfulness of his conduct or conform his behavior to the requirements of the law.  Id. at 546-547.  Since McHoul, our cases have evolved, addressing the impact of a defendant's voluntary consumption of drugs or alcohol on criminal responsibility.  In Commonwealth v. McGrath, 358 Mass. 314, 319-320 (1970), we emphasized that a mental disease or defect is the sine qua non of a lack of criminal responsibility defense, holding that the defense is not available where the defendant's loss of the substantial capacity to appreciate the wrongfulness of his conduct or conform his behavior to the requirements of the law is caused by the voluntary consumption of drugs or alcohol as opposed to a mental disease or defect.  Later cases affirmed the necessity of a causal relationship between a mental disease or defect and lack of criminal responsibility.  See, e.g., Commonwealth v. Sheehan, 376 Mass. 765, 767 (1978).

In Berry, we revisited the relationship between the defendant's voluntary consumption of drugs or alcohol and lack of criminal responsibility.  We set forth jury instructions that included a provision that allowed for a defense of lack of criminal responsibility even where the defendant voluntarily consumed drugs or alcohol:  "Where a defendant has an active mental disease or defect that caused [him] to lose the

substantial capacity to appreciate the wrongfulness of [his]
conduct or the substantial capacity to conform [his] conduct to
the requirements of the law, the defendant's consumption of
alcohol or another drug cannot preclude the defense of lack of
criminal responsibility." Berry, 457 Mass. at 618. In
DiPadova, 460 Mass. at 432, we considered again the interplay
between a mental disease or defect that, unlike in Berry, did
not independently cause the defendant to lack criminal
responsibility, and the voluntary consumption of drugs and
alcohol. We clarified that in these circumstances, the defense
is available but only if the defendant lacked knowledge that the
voluntary consumption of drugs or alcohol would trigger a
"latent"[17] mental disease or defect that would cause him to lack
criminal responsibility. Id.

Here, the judge gave the following instruction regarding
the impact of the voluntary consumption of drugs or alcohol on
the defendant's entitlement to a lack of criminal responsibility
defense:

> "The issue has been raised that the defendant may not
> have been criminally responsible for his alleged actions
> due to his use of drugs or alcohol. Voluntary intoxication
> with drugs or alcohol is not by itself a mental disease or

---

[17] Here, in making the reference to a "latent" mental
disease or defect, the judge did not have the benefit of our
caution in DiPadova, 460 Mass. at 432 n.10, that "the use of
such terms ['latent' and 'activation'], particularly in jury
instructions, may be confusing." In any event, the use of the
terms did not constitute error.

defect that will support a verdict of not guilty by reason of insanity. The normal consequences of drug and alcohol addiction are not a basis for relieving a defendant of criminal responsibility. However, there may be situations where a defendant who is addicted to drugs or alcohol might have a defense of lack of criminal responsibility available to him. You may consider whether the defendant had a mental disease or defect, apart from his drug or alcohol addiction, such that he lacked substantial capacity at the time of his crime to conform his conduct to the requirements of the law.

"In addition, you may consider whether the defendant's voluntary consumption of drugs or alcohol activated a latent mental disease or defect apart from the addiction itself. If as a result of the activation of that latent mental disease or defect, the defendant lost the substantial capacity to understand the wrongfulness of his conduct . . . or to conform his conduct to the requirements of the law, the defendant would lack criminal responsibility. However, if the defendant knew or subjectively had reason to know under the circumstances that his use of drugs or alcohol would activate the latent mental disease or defect, he may not rely on that disease or defect to assert lack of criminal responsibility. In deciding what the defendant subjectively had reason to know, you should consider the question solely from the defendant's point of view, including his mental capacity.

"Thus, if the Commonwealth has proved beyond a reasonable doubt that the defendant knew or had reason to know that his consumption of alcohol or drugs would activate a mental disease or defect, then you must find that the defendant was criminally responsible for his actions. It is not necessary that the defendant knew or had reason to know that he had a mental disease or defect, as long as he knew that his voluntary consumption of drugs or alcohol would trigger inappropriate conduct."

As the Commonwealth notes, the jury instructions substantially comported with the generally accepted Superior Court jury instructions for explaining the impact of the voluntary consumption of drugs or alcohol on criminal

responsibility. See Massachusetts Superior Court Criminal Practice Jury Instructions, §§ 3.1, 3.1.1(b) (Mass. Cont. Legal Educ. 1999 & supp. 2003). The defendant, however, takes issue with this instruction, claiming that the reference to a "latent" mental disease or defect was improper under DiPadova in the absence of evidence that the defendant knew of the effect of drugs or alcohol on his mental illness and that it was otherwise inconsistent with Berry.

The defendant's argument that the instructions were erroneous under DiPadova fails. The Commonwealth presented ample evidence that the defendant knew his consumption of drugs would exacerbate the symptoms of his mental illness, especially in his confession to police. See DiPadova, 460 Mass. at 436-437. Thus, we discern no error in this aspect of the judge's instructions.

For reasons unknown, however, the judge and parties failed to avail themselves of the revised instruction in Berry. Although the judge correctly instructed the jury to "consider whether the defendant had a mental disease or defect, apart from his drug or alcohol addiction, such that he lacked substantial capacity at the time of the crime to conform his conduct to the requirements of the law," he neglected to inform the jury that in such a case, the defendant's consumption of alcohol or another drug cannot preclude the defense of lack of criminal

responsibility.  Thus, the failure to instruct in accordance with Berry was error.  See Berry, 457 Mass. at 617-618.

Because the defendant did not object to the jury charge on this ground (or raise the issue in his brief), we review the error for a substantial likelihood of a miscarriage of justice. See id. at 618.  "In analyzing a claim under the substantial likelihood standard, we review the evidence and case as a whole and consider whether any error made in the course of the trial was likely to have influenced the jury's conclusion."  Id., citing Commonwealth v. Wright, 411 Mass. 678, 682 (1992).  We conclude that the erroneous jury instructions regarding the impact of voluntary consumption of drugs on the lack of criminal responsibility defense did not create a substantial likelihood of a miscarriage of justice.

In assessing prejudice, the issue we decide is whether the failure to inform the jury that the voluntary consumption of drugs or alcohol does not vitiate the defense if the defendant's mental illness was an independent cause of his lack of criminal responsibility likely influenced the jury's verdict.  We conclude that it did not.

Here, the defendant presented no evidence that at the time of the shootings, his mental disease or defect was active, such that he lacked substantial capacity to conform his conduct to

the law.[18]  See Berry, 457 Mass. at 617-618.  Of the defendant's three expert witnesses, only Spiers opined that the defendant lacked criminal responsibility at the time of the murders. Although Spiers agreed that the defendant was able to appreciate the wrongfulness of his conduct, he believed that the defendant lacked the substantial capacity to conform his conduct to the requirements of the law, based on his neurodevelopmental deficits, mental illness, and drug addiction.  The jury heard Mezzacappa's opinion, however, that the defendant suffered from schizoaffective disorder, but that the symptoms of mental illness can worsen with substance abuse.  Bluestone testified that she could not determine the source of the defendant's reported symptoms because of his ongoing, varied substance abuse, where his symptoms were consistent with mental illness and substance abuse and withdrawal from substance abuse.  None of the expert testimony suggested that mental illness alone was the cause of the defendant's alleged lack of capacity.  Cf. id. at 617-618.  See DiPadova, 460 Mass. at 432.  Therefore, the judge's omission of the Berry instruction, although erroneous, did not prejudice the defendant where there was no evidence that the defendant's mental illness, regardless of his consumption of

---

[18] The experts for the Commonwealth and the defendant who opined on the matter agreed that the defendant had the capacity to appreciate the wrongfulness of his conduct.

illegal drugs, caused him to lose substantial capacity.  Berry,
supra.

b.  Other jury instructions.  The defendant argues that
certain other jury instructions were flawed.  Specifically, he
argues that two of the instructions, concerning armed home
invasion and armed assault with intent to murder, impermissibly
contained language requiring a guilty finding where the jury
found that the Commonwealth proved each element beyond a
reasonable doubt.  He also argues that three instructions,
concerning armed assault with intent to murder, voluntary
manslaughter, and unlawful possession of a firearm, failed to
include language instructing the jury that, if they found that
the Commonwealth failed to prove each element beyond a
reasonable doubt, then the jury must find the defendant not
guilty.  The defendant's arguments are unavailing.  Because the
defendant did not object to the jury charge, we review for a
substantial likelihood of a miscarriage of justice.  See
Commonwealth v. Rodriguez, 437 Mass. 554, 559 (2002).  "Error in
a charge is determined by reading the charge as a whole, and not
by scrutinizing bits and pieces removed from their context."
Id., quoting Commonwealth v. Gunter, 427 Mass. 259, 267 (1998).

The judge charged the jury on nine offenses.  For all nine,
the judge instructed the jury that, if they found that the
Commonwealth had proved each element beyond a reasonable doubt,

then they <u>must</u> return a guilty verdict.  In addition, six of the nine instructions included the instruction that if the jury found that the Commonwealth had failed to prove each element beyond a reasonable doubt, then they must find the defendant not guilty.  In the instructions for armed assault with intent to murder, voluntary manslaughter, and illegal possession of a firearm, the judge neglected to add the latter instruction.  Although this was error, there was no substantial likelihood of a miscarriage of justice.  The jury were properly instructed regarding the burden of proof on several occasions during the charge.  "Viewed as a whole, the charge to the jury indicated that it was the jury's duty to [determine if] the Commonwealth has met its burden of proving every element of the crime beyond a reasonable doubt before they could convict."  <u>Commonwealth</u> v. <u>Giguere</u>, 420 Mass. 226, 232 (1995), quoting <u>Commonwealth</u> v. <u>Sellon</u>, 380 Mass. 220, 234 (1980).

    c.  <u>Inference of sanity instruction</u>.  In <u>Commonwealth</u> v. <u>Lawson</u>, 475 Mass. 806, 815 (2016), we concluded that "the inference that the defendant is criminally responsible because the great majority of persons are criminally responsible is not sufficient alone to warrant a rational finder of fact to conclude beyond a reasonable doubt that a defendant is criminally responsible."  We further determined that "given the meager weight of this inference and the risk of juror confusion

regarding the burden of proof, judges should not instruct juries regarding this inference." Id. at 815 n.8. Here, the jury were instructed as follows:

> "In determining whether the defendant was sane at the time of the alleged crime, you may consider the fact, if you so desire, that a great majority of men are sane and the resulting probability that any particular man was sane. It is for you do decide whether to draw that inference. The fact that I have given you this inference does not mean that you must adopt it. It is something you may not adopt, depending on how you view all of the evidence, including medical evidence given by the psychologists and other witnesses who have testified in this case."

This is substantially similar to the instruction that we discontinued in Lawson, supra at 815 n.8.[19] Here, the defendant is entitled to the benefit of Lawson, as that case was released while the defendant's appeal was pending on direct review. See Commonwealth v. Johnston, 467 Mass. 674, 704 (2014). Therefore, although the defendant did not raise this claim of error on appeal, we review to determine whether this error created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Griffin, 475 Mass. 848, 863 (2016). We conclude it does not.

Although the instruction regarding the inference of sanity was error, the judge ameliorated the error where he specifically instructed the jury that they did not have to draw such an

---

[19] This instruction has since been removed from the Model Jury Instructions on Homicide. See Commonwealth v. Griffin, 475 Mass. 848, 863 (2016), citing Model Jury Instructions on Homicide 1-12 (2013).

inference, especially in light of the jury's view of the expert medical testimony. "Where the trial judge strongly and specifically instructed that the burden is on the Commonwealth to prove criminal responsibility beyond a reasonable doubt and where there was substantial evidence supporting the jury's finding of criminal responsibility, we conclude that this instruction did not create a substantial likelihood of a miscarriage of justice." Griffin, 475 Mass. at 863.

d. Prosecutor's closing argument. The defendant argues that the prosecutor improperly demeaned the defense of lack of criminal responsibility, misstated the evidence and the law, and vouched for the credibility of the defendant's witnesses. The defendant did not object to the prosecutor's closing argument, so we review for a substantial likelihood of a miscarriage of justice. Commonwealth v. Braley, 449 Mass. 316, 329 (2007). "Closing arguments must be viewed 'in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial.'" Id. at 328-329, quoting Commonwealth v. Colon-Cruz, 408 Mass. 533, 553 (1990).

During his closing argument, the prosecutor stated that the defendant was using his mental illness as a "crutch." He referred to the defendant's statements to a family member made during a telephone call that was recorded during his police interview. The defendant told his family member, "I need all my

psych papers, all my medical papers ready, everything, all my history."  The prosecutor told the jury that it was then that the defendant created his defense.  He went on to say, "[i]t's a crutch, is what it is.  As I said, [the defendant] may have some [mental] infirmities, but he's using it as a crutch to say that he wasn't responsible."  Although the prosecutor's characterization of the defense of lack of criminal responsibility was better left unsaid, it did not rise to the level of creating a substantial likelihood of a miscarriage of justice.  He was properly suggesting that the defense of lack of criminal responsibility was weak, and that although the defendant may suffer from mental illness, he was criminally responsible on July 8-9, 2007.  See Commonwealth v. Lewis, 465 Mass. 119, 129-130 (2013).

Similarly, in his closing argument the prosecutor suggested that the defendant was "not a raving lunatic," that he was "rational" and that "he wasn't some recluse in a darkened room with the shades pulled, not going out."  These statements were rhetorical and referenced the evidence of the defendant's ability to be an active parent and spouse when he was not on drugs.  See Commonwealth v. Simpson, 434 Mass. 570, 586 (2001).  Especially where the jury heard evidence of the defendant's malingering and exaggerating the symptoms of his mental illness, the prosecutor's comments did not prejudice the defendant.

Compare Lewis, 465 Mass. at 128-130 (reversal warranted where prosecutor suggested that entire defense was "sham" and insulted defendant by repeatedly referring to him as "street thug" during closing argument), with Simpson, supra, quoting Commonwealth v. Wilson, 427 Mass. 336, 350 (1998) (prosecutor's characterization of defense argument as "insult" and "'enthusiastic rhetoric' not ground for reversal and juries presumed to have measure of sophistication to sort out excessive claims").

The defendant's argument that the prosecutor misstated the law is without merit.  Although the defendant correctly notes that the Commonwealth's burden was to prove that the defendant had the substantial capacity to conform his behavior to the requirements of the law, it was not improper for the prosecutor to refer to the defendant's behavior as "rational."  Moreover, the prosecutor's characterization of the defendant as a "faker" was based on evidence, as Towers opined that the defendant was exaggerating and feigning symptoms while he was hospitalized at Bridgewater.

Finally, the defendant asserts that the prosecutor improperly vouched for the credibility of Mercier and Towers. We disagree.  "Improper vouching occurs if 'an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury.'"  Commonwealth v. Kee, 449 Mass. 550,

560 (2007), quoting Commonwealth v. Ortega, 441 Mass. 170, 181 (2004). Here, the prosecutor did not express any personal belief in the credibility of the witnesses, nor did he suggest that he had any personal knowledge that supported the witnesses' credibility. See Kee, supra. The prosecutor merely observed that Mercier was "a very moving witness, a very candid and honest witness in all of her answers, on both direct and cross," and that Towers gave a "very candid appraisal of the defendant's mental state." The prosecutor's comments were proper. See id.

e. Relief pursuant to G. L. c. 278, § 33E. The defendant requests that this court exercise its power under G. L. c. 278, § 33E, to reverse his convictions and either order a new trial or enter judgments of not guilty by reason of mental disease or defect. "When we undertake review under § 33E, we do not function as a second jury. . . . That is we do not determine what verdict we would have returned but whether the verdict 'was against the law or weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require'" (citation omitted). Johnston, 467 Mass. at 705, quoting G. L. c. 278, § 33E. We have examined the entire case, considered the law and the evidence, and conclude that the defendant is not entitled to any relief from the judgments against him. See Commonwealth v. Brown, 376 Mass. 156, 167 (1978).

<u>Judgments affirmed</u>.