NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-818                                          Appeals Court

              COMMONWEALTH  vs.  JACOB E. SHIN.

                        No. 13-P-818.

       Suffolk.     April 14, 2014. - September 25, 2014.

            Present:  Green, Hanlon, & Hines, JJ.[1]


       Indecent Assault and Battery.  Mental Impairment.  Insanity.



       Complaint received and sworn to in the Central Division of
the Boston Municipal Court Department on January 24, 2011.

       The case was heard by Annette Forde, J.


       Katherine Godin for the defendant.
       Zachary M. Hillman, Assistant District Attorney (Neil J.
Flynn, Jr., Assistant District Attorney, with him) for the
Commonwealth.


       HANLON, J.  After a jury-waived trial, the defendant was

convicted of indecent assault and battery on a person fourteen

_____

       [1] Justice Hines participated in the deliberation on this
case while an Associate Justice of this court, prior to her
appointment as an Associate Justice of the Supreme Judicial
Court.

years of age or older.[2]  He argues that his motion for a required

finding of not guilty should have been allowed because there was

insufficient evidence to prove that he was criminally

responsible at the time of the crime.  In addition, he argues

that the judge employed the wrong analysis in determining that

he was criminally responsible.  We agree that the analysis was

flawed and therefore reverse.

Background.  At approximately five o'clock in the evening

on January 20, 2011, the victim boarded a Massachusetts Bay

Transportation Authority (MBTA) Green Line subway train at Park

Street station, heading for Cleveland Circle.  It was rush hour

and the train was crowded; she stood with her back against the

wall by the "accordion bend" in the middle of the train in an

attempt to allow space for other passengers.

At the Copley stop, many people entered the train and it

became very crowded; the defendant boarded with the other

passengers and he went to stand "very close" to the victim, so

close that he made her uncomfortable, "and he was touching [her]

arm on [her] left side."  After the train left Copley and before

the next stop (Hynes Convention Center), the defendant lifted

his hand and touched the victim between her legs on her upper

thigh, within "two inches" of her genital area.  She testified

---

    [2] The defendant also was charged with failure to register as
a sex offender (count II); that count was dismissed at the
request of the Commonwealth at trial.

that "[i]t was very high on [her] leg." As soon as the defendant put his hand on the victim's leg, she lifted up her left arm and, pushing him in the center of his chest, "said watch your hands. [She] pushed him as far as [she] could push him away from [her]."

The victim got off the train at the Hynes Convention Center stop because she "wanted to get out of the enclosed train car"; the defendant also got off the train at that stop, and the victim watched from the platform as he passed through the fare gate and climbed the stairs toward the station exit. She then felt safe enough to get back on the next train and continue to her intended stop.

MBTA transit officers obtained videotape footage from the Hynes Convention Center station; the victim identified the defendant on the tape and the officers then obtained "fare gate information" for the time shown on the videotape. They determined the defendant's name and home address from his "transportation access pass" or "Charlie" card.[3]

The following day, three transit officers went to the defendant's home and spoke with him. At their request, he provided his Charlie card and, "immediately" after checking the numbers on the card, the officers gave the defendant a Miranda

---

[3] The videotape showed the defendant leaving the Hynes Convention Center station, and then coming back into the station twenty minutes later.

warning.  The defendant then asked for privacy because "[h]e did not want the other people in the home to know what [they] were talking about"; as a result, the defendant and all three officers moved into a room adjacent to the entrance door to continue their conversation.  The defendant later agreed to accompany the officers back to the MBTA transit police headquarters; while traveling in the officers' unmarked car, the defendant stated that "he did have a problem" relating to the incident that they were investigating, and that he had medication but was not presently taking it.

MBTA transit police Lieutenant Mark Gillespie testified that, at some point during his conversation with the defendant, the defendant "mentioned the word lawyer" and the officers did not ask any more questions about the incident.  Gillespie also testified that the defendant had "two distinct changes in his behavior" while the officers were at the defendant's home and then while being transported to headquarters.[4]

At the jury-waived trial, the defendant's primary defense was lack of criminal responsibility, specifically that he was

---

[4] When the officers first arrived, the defendant was very relaxed, quiet, cooperative, answering questions without hesitation and "welcoming [the officers] into [his] home." After he was placed in the back of the unmarked police car and on the way to police headquarters, the defendant was more reserved and thoughtful; his "answers were less forthcoming" and "seemed to be calculated."  Gillespie's perception of the defendant was that "he knew he was in trouble."

unable to "conform [his] conduct to the requirements of the law." Commonwealth v. Berry, 457 Mass. 602, 612 (2010). His sole witness was Dr. Susan Lewis, a forensic psychologist at the Worcester Division of the District Court Department.[5] Dr. Lewis had seen the defendant first in 2005 for an "aid in sentencing examination" at the Erich Lindemann Mental Health Center (Lindemann Center). See G. L. c. 123, § 15(e). At that time, the defendant had been charged with indecent assault and battery on a person fourteen years old or older; "he was experiencing auditory hallucinations," along with "grandiosity in terms of the stories he was telling at that time."[6] Dr. Lewis diagnosed him in 2005 with schizophrenia. In connection with the proceedings in this case, she also reviewed diagnoses from other doctors who had seen the defendant between 2005 and her evaluation in 2011, and testified that "there's no dispute that he's been suffering from schizophrenia."[7]

---

[5] Dr. Lewis's September 20, 2012, criminal responsibility evaluation report was admitted at trial as exhibit 3 (report).

[6] As to the auditory hallucinations, Dr. Lewis testified that "[the defendant] at times, believes that the government is speaking to him. At other times, he believes that the voices are telling him that he has a particular mission on this earth. At other times, the voices are somewhat paranoid. He believes that he sees something, for example, on a computer that's likely not there."

[7] Dr. Lewis personally interviewed the defendant, reviewed the MBTA police reports, reviewed recent records from Massachusetts Mental Health Center where the defendant is a

The defendant has a significant history of hospitalization for mental illness. Specifically, between 2005 and 2009, he was hospitalized by court order on six different occasions.[8] In May, 2007, a guardian was appointed for the defendant with "Rogers

patient, and reviewed previous evaluations dating from 2005 prepared by her and other mental health professionals.

[8] The first hospitalization was in 2005, as described by Dr. Lewis. The second, a three-month hospital stay, occurred at the end of 2005 and the beginning of 2006, after the defendant was charged with possession of a Class D substance with intent to distribute; at that time, Dr. Jamie Kraus conducted a competency evaluation and diagnosed the defendant with bipolar disorder and schizoaffective disorder, marked by recurring symptoms of rapid mood change, paranoia, and disordered thinking. The defendant was hospitalized for the third and fourth times in August, 2006, when he was charged with an indecent assault and battery (after an evaluation, the court found him competent to stand trial), and on September 15, 2006, for a competency evaluation as part of a probation violation hearing for refusing to take his medication (he remained hospitalized for the next two years, eventually being discharged in September, 2008). The fifth hospitalization occurred after testing in August, 2007, when it was suggested that the defendant's "scores and response pattern 'fell into the statistical range for symptom malingering.'" At a hearing in November, 2007, Dr. Lewis suggested to the court that the defendant's "active symptoms of mental illness had improved and he was again, at that time, competent." The court disagreed and recommitted him until September, 2008, when Dr. Amani Wilson reevaluated the defendant. Dr. Wilson opined that the defendant had been doing well for the previous six months and was then competent; the court agreed and ordered the defendant discharged. The defendant was hospitalized for the sixth time in April, 2009. He had been arrested for an assault and battery in March, 2009, had left the Commonwealth for a period of time, and then turned himself in to authorities. Dr. Prudence Baxter conducted a G. L. c. 123, § 15(b), competency and criminal responsibility evaluation, concluding that the defendant was psychotic; he was released in August, 2009, and ordered to wear a monitoring ankle bracelet.

authority" to consent to medication.  See <u>Rogers</u> v. <u>Commissioner of Dept. of Mental Health</u>, 390 Mass. 489 (1983) (<u>Rogers</u>).

Apparently, there are no records available for the time period between November, 2009, when the defendant was released from the Lindemann Center -- with an ankle bracelet that he immediately removed -- and December, 2010, when the defendant met with a psychiatrist, presenting "with hypomanic symptoms." At that time, the defendant made it clear that "he was not going to take his medication."  "He had refused it.  He was experiencing manic symptoms, very agitated, irritable."  In addition, apparently, the defendant was experiencing some difficulty obtaining the medication.  Dr. Lewis's report states that the defendant was "insisting his Mass Health card was being declined.  <u>Problems with his card were remedied</u> and the pharmacy was notified" (emphasis supplied).

In summary, Dr. Lewis opined that the defendant "has a confirmed severe and persistent mental illness that has been ongoing for the previous [seven] years. . . . [O]ne consistent finding is that his ability to perceive reality is significantly impaired.  When he willingly takes his medication his symptoms are muted although never in complete remission."  In addition, the defendant

> "suffers from the paraphilia called Frotteurism.
> Frotteurism refers to the paraphilic interest in rubbing
> against a non-consenting person for sexual gratification.

It may involve touching any part of the body including the genital area. . . . With the overlay of non-compliance with taking his medication and the subsequent resulting psychotic symptoms it is difficult to clearly discern the relative weight of each state.  By [the defendant's] present report and previous findings of psychosis from earlier evaluations, it seems likely that [the defendant] was experiencing active symptoms of mental illness at the time of the alleged events.  As previously noted, at these times, [the defendant] misreads social cues and misinterprets the cues of his victims as beckoning and provocative and that she may welcome his advances. . . . It is more likely than not that during the index event [the defendant's] ability to conform his behaviors to the requirements of the law was significantly impaired by this mental state.  In addition, when [the defendant] refuses to take his medication his psychotic symptoms become exacerbated and prominent affecting his impulse control. . . . His mental stability at this time is distorted by psychosis and his sexualized state, compromising his ability to appreciate the wrongfulness of his conduct."[9]

At trial, Dr. Lewis testified that, at the time at issue, "[the defendant] was not taking his medication . . . , was experiencing an increase in some of the symptoms that he's experienced over the seven years, that he misinterprets his social cues in the environment thinking an individual is communicating something to him when in actuality they are not, he is agitated, he's irritable, he is likely experiencing ideas of reference which is that an individual engages in a particular act that has nothing whatsoever to do with him and he interprets it as a message to him in some way, that given those circumstances, that he's unable to appreciate the wrongfulness

---

[9] Dr. Lewis also noted "a significant history of malingering."

of his conduct or conform his behaviors to the requirements of the law."

After hearing all the evidence, the judge requested further arguments and briefing from both counsel on the issue whether the defendant knew that his failure to take his medication would cause him to act in a manner that was against the law and, if so, whether that would permit a finding that he was criminally responsible. After reviewing those arguments, the judge found that the defendant was criminally responsible, stating that the defendant "was aware that if he failed to take his medication, it would result in this kind of behavior once again . . . . He has had enough contact with the court system and enough treatment by this doctor who testified and other doctors that make it very clear to him that he needs to take his medication or he would be right back where he started."[10] The judge alluded to Commonwealth v. McGrath, 358 Mass. 314 (1970), and Commonwealth v. Berry, 457 Mass. 602, stating that the principles announced in those cases were applicable here. Specifically, the judge found that the defendant "knew that if

---

[10] The judge also pointed out that the defendant had had the presence of mind to get off the train after the victim pushed him, wait about twenty minutes, and then return to the station and get on another train. In addition, she considered the fact that he had asked to speak to the investigators privately so that other people in the house would not hear what was going on. She concluded that "he's not so psychotic that he's not able to think pretty clearly."

he didn't take his medication" he was likely to commit further crimes "and he went ahead anyway and stopped taking his medication."  On that basis, the judge found the defendant criminally responsible.

Discussion.  "In reviewing the denial of a motion for a required finding of not guilty, we 'determine whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the [factfinder] to infer the existence of the essential elements of the crime charged [citation omitted]. . . . [T]he evidence and the inferences permitted to be drawn therefrom must be "of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt . . . ."' Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979)." Commonwealth v. Sokphann Chhim, 447 Mass. 370, 376-377 (2006). All permissible inferences are drawn in favor of the Commonwealth. Id. at 377.  Here, although the defendant at trial argued that there was insufficient evidence that he intended to commit an indecent assault and battery, on appeal, he argues only that he was not criminally responsible at the time of the incident and that, in reaching a contrary conclusion, the judge employed the wrong analysis.

Some things are not in dispute.  The defendant is mentally ill, suffering from a major mental illness as well as a separate personality disorder.  As noted, despite some history of exaggeration of symptoms when it served his purposes, he also has a long history of treatment and hospitalization for mental illness.  In addition, the defendant has a significant history of noncompliance with his prescribed medication and the evidence indicates that the symptoms of his mental illness never disappear completely.

In Commonwealth v. Berry, 457 Mass. at 617 n.9, the court set out a jury instruction for cases "[w]here the Commonwealth offers evidence that the defendant knew or had reason to know of the effects of drugs or alcohol on [his] . . . mental disease."  The instruction explained that, "if the Commonwealth has proved beyond a reasonable doubt that the defendant consumed drugs or alcohol knowing or having reason to know that the drugs or alcohol would activate a latent mental disease or intensify an active mental disease, causing [him] to lose the substantial capacity to appreciate the wrongfulness of [his] conduct or the substantial capacity to conform [his] conduct to the

requirements of the law, then you would be warranted in finding the defendant criminally responsible."[11]

The court refined that holding the next year in Commonwealth v. DiPadova, 460 Mass. 424, 436-437 (2011), saying, "there was evidence . . . indicating that [the defendant] knew at the time of the murder that drugs intensified the symptoms of his mental illness.  In light of that evidence, it was critical that the instructions given to the jury clarify how the defendant's knowledge was to be considered.  Specifically, the jury should have been instructed that (1) if the defendant's mental illness did not reach the level of a lack of criminal responsibility until he consumed drugs, he was criminally responsible if he knew (or should have known) that the consumption would have the effect of intensifying or exacerbating his mental condition; and, in contrast, (2) if the defendant's mental illness did reach the level of lack of criminal responsibility even in the absence of his consumption of drugs, it was irrelevant whether he took drugs knowing that they would exacerbate that condition."

The issue in this case is arguably similar, but distinguishable in a number of ways.  Obviously, here, the question is not whether the defendant knowingly and voluntarily

---

[11] The distinction between latent and active mental illness was eliminated in Commonwealth v. DiPadova, 460 Mass. 424, 432 n.10 (2011).

consumed alcohol or drugs that exacerbated his inability to understand the wrongfulness of his behavior or undermined his capacity to conform his behavior to the requirements of the law, but whether his failure to take prescribed medication had those effects.  It is not at all clear that the situations are analogous; mentally ill people fail to take prescribed medication for a myriad of reasons, including, for example, side effects that may be otherwise dangerous to their health.[12]  See Guardianship of L.H., 84 Mass. App. Ct. 711, 724 n.3 (2014) (Agnes, J., dissenting).  In addition, some people are unable to obtain the appropriate medication because of lack of money or access to medical care, or problems with necessary paperwork such as may have occurred in this case.  A decision not to take a prescribed medicine, though it may be ill-advised, is different in kind from a decision to ingest alcohol or drugs that are not prescribed.  In addition, some medications work better than others, or take time to become effective, and the difficulty of discerning when, exactly, someone stopped taking

---

[12] "Apart from side effects and illness insight, main reasons for non-compliance . . . were forgetfulness, distrust in therapist, and no subjective need for treatment.  Other notable reasons were stigma and advice of relatives/acquaintances against neuroleptic medication.  Gain from illness was a reason for non-compliance in 11-18% of the psychosis patients." Moritz, Peters, Karow, Deljkovic, Tonn, & Naber, Cure or Curse? Ambivalent Attitudes Towards Neuroleptic Medication in Schizophrenia and Non-Schizophrenia Patients, 1 Mental Illness 4, 4 (2009).

medication and what his mental state was at that time would be challenging at best.  Finally, as noted, a guardian had been appointed for this defendant in 2007 in a substituted judgment proceeding pursuant to Rogers.  Such a proceeding necessarily would have involved a decision that the defendant was not competent to make medical decisions at least at that time.[13]

Ordinarily, a determination that a defendant lacks criminal responsibility by reason of mental disease or defect ends the inquiry and requires an acquittal.  Berry and DiPadova represent an exception to that general rule.  Those decisions each start with the proposition that the defendant in that case was not criminally responsible at the time of the crime; the question was whether the lack of responsibility was produced by the voluntary consumption of drugs or alcohol with the knowledge that it would render that defendant not criminally responsible. "The source of the lack of substantial capacity [was] the critical factor in determining whether the defendant [was] criminally responsible" in those cases.  DiPadova, 460 Mass. at 431.  It strains that analysis considerably to apply it to a defendant such as this, because his mental illness is not caused by his failure to take medication, even though the medication

---

[13] The record indicates that, at the time of the trial, the defendant was "under a Rogers guardianship" and that he was taking prescribed antipsychotic medication by injection and had been doing so during the eighteen months between his arrest on this offense and the trial.

might alleviate it somewhat or even entirely.  Whether the Berry-DiPadova analysis is proper in a case such as this is a difficult question and one for which our cases -- and those of other jurisdictions -- provide little guidance.  On balance, we are persuaded that it does not apply on the facts of this case.  That is, Berry and DiPadova have no applicability in a circumstance where the allegation is that the defendant's lack of criminal responsibility arises only from a failure to take prescribed medication.  The appropriate analysis was simply whether, at the time of the incident, the defendant was criminally responsible.

Here, in seeking to resolve the question of the defendant's criminal responsibility, the judge erroneously took an additional step of inquiring whether the defendant's lack of criminal responsibility was caused by his failure to take prescribed medications.  As a result, we cannot discern whether she actually made a determination that this defendant in fact lacked the requisite capacity at the time of the crime and, if so, whether that lack of capacity was due to a mental disease or defect.

In addition, even if the Berry-DiPadova analysis were appropriately applied to this case, the important question would be whether, at the time that the defendant refused his medication, he was criminally responsible.  The evidence

suggests the answer may very well be no. The Commonwealth argues that the judge addressed this issue when she said "it has also been established that whenever [the defendant] is compliant with his medication he's fine. Every single time he has had an issue, and he's a very intelligent young man from all accounts, every time he has had a problem with the court system, it has been because he is non-compliant with the medications prescribed for him." In fact, the evidence may not have been so clear cut; Dr. Lewis's testimony was only that "if he's compliant with taking his medication, the symptoms of his mental illness diminish substantially."

Second, even if the evidence established that the defendant was criminally responsible when he was compliant with his medication, there is no evidence that this defendant ever was compliant with his medication between the time that he was released from the Lindemann Center in November, 2009, and the date of this crime on January 20, 2011. There is a gap in the record of the defendant's mental health history from November, 2009, until December, 2010, when he was back in contact with his doctors. During the time between December, 2010, and January, 2011, when this offense occurred, the medical records show that the defendant appeared with "manic symptoms," was "irritable" and "agitated," and refused medication. There is also some evidence indicating that the defendant had had difficulty

obtaining his medication because of insurance problems.
Finally, we note that the Commonwealth's argument, taken to its
logical extreme, could be used to argue that every mentally ill
defendant who had ever taken helpful medication in the past, but
discontinued it, was criminally responsible.

We are mindful of the presumption that the judge correctly
instructed herself on the law. See Commonwealth v. Aponte, 71
Mass. App. Ct. 758, 764 (2008). Moreover, we acknowledge the
care with which the judge decided this issue. However, the
question of the appropriate analysis for a situation in which a
mentally ill defendant stops taking prescribed medication and
the effect of that action on his criminal responsibility is a
matter for which there is no guiding case law. After careful
review, we are persuaded that it was prejudicial error to apply
the Berry-DiPadova analysis here. The defendant, therefore, is
entitled to a new trial. The judgment is reversed and the
finding set aside.

So ordered.