NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11784

COMMONWEALTH  vs.  PATRICK WAWERU.


Essex.     April 6, 2018. - July 31, 2018.

Present:  Gants, C.J., Gaziano, Budd, & Kafker, JJ.


Homicide.  Armed Home Invasion.  Armed Assault with Intent to
     Murder.  Assault and Battery by Means of a Dangerous
     Weapon.  Reckless Endangerment of a Child.  Constitutional
     Law, Admissions and confessions, Voluntariness of
     statement, Trial jury-waived.  Evidence, Admissions and
     confessions, Voluntariness of statement, Privileged
     communication, Communication between patient and
     psychotherapist, Insanity.  Psychotherapist.  Privileged
     Communication.  Insanity.  Practice, Criminal, Capital
     case, Admissions and confessions, Voluntariness of
     statement, Waiver, Motion to suppress, Instructions to
     jury, Presumptions and burden of proof, Acquittal by reason
     of insanity, Reasonable doubt, Trial jury-waived.



     Indictments found and returned in the Superior Court
Department on November 28, 2007.

     A pretrial motion to suppress evidence was heard by David
A. Lowy, J., and the cases were tried before Richard E. Welch,
III, J.


     Richard L. Goldman for the defendant.
     Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.

KAFKER, J.  A jury convicted the defendant, Patrick Waweru, of murder in the first degree on the theories of premeditation and extreme atrocity or cruelty, among other offenses.  The defendant's primary defense at trial was that he lacked criminal responsibility for the murder because he suffers from mental illness.  On appeal, the defendant argues error as to (1) the motion judge's denial of his motion to suppress statements made to a psychiatrist who interviewed him in the presence of police officers guarding him at the hospital; (2) the jury instructions regarding the presumption of sanity, the consequences of finding the defendant not guilty by reason of insanity, the failure to take prescribed medications, and reasonable doubt; and (3) the denial of his request for a jury-waived trial.  For the reasons stated below, we affirm.  After a thorough review of the record, we also decline to exercise our authority under G. L. c. 278, § 33E.

1.  Background.  We summarize the facts that the jury could have found at trial, reserving certain details for our discussion of the legal issues.

The defendant was in an on-again, off-again relationship with the victim.  The couple had two children together.  The victim's sister occasionally lived with the victim and the defendant, but the sister did not get along with the defendant.

The victim's mother also lived with the victim and the defendant for a time.

The defendant has a history of mental illness. In 2002, he was diagnosed with bipolar disorder II and a personality disorder with impulsive features. He received outpatient medical health care. In 2005, he was hospitalized for taking an overdose of his prescribed psychiatric medications. He reported feeling that he was being "mistreated by his girlfriend and the legal system." During his hospitalization, the defendant was diagnosed with a major depressive disorder, but the hospital clinicians did not find sufficient evidence to substantiate a bipolar disorder II diagnosis. In early 2007, he was hospitalized and again diagnosed with bipolar disorder.[1] He was prescribed mood stabilizing medication, Depakote; an antipsychotic medication, Risperdal; and an antidepressant. During this hospitalization, he threatened to kill the victim.

At the time of his arrest, the defendant was working two jobs, one as a residential counsellor for a mental health facility, and the other at a nursing home. The victim's sister testified that when the defendant and the victim were fighting, the defendant would periodically say that "even if he killed [the victim's sister] or [the victim], nothing would happen to

---

[1] The hospital diagnosis was not specific as to whether this was bipolar disorder I or bipolar disorder II.

him because . . . he was bipolar."

In early 2007, the defendant moved out of the apartment he shared with the victim.  Around this time, he told the victim's mother, "When you get to Kenya, be prepared to receive two coffins, because I'm going to kill these daughters of yours.  And I'm starting with [the victim's sister].  [She] will not raise my children.  Instead, they'll be raised by the [S]tate." Later the same year, the victim, her children, and her mother moved to Delaware, primarily to get away from the defendant. The victim's sister remained in Massachusetts.

On the weekend of October 14, 2007, the victim, her daughters, and her mother returned to Massachusetts, ostensibly for a Housing Court appearance related to the apartment the defendant and the victim had previously shared.[2]  During their visit, they stayed in the victim's sister's one-bedroom apartment in Lynn.

The victim left her sister's apartment in the early morning on October 15.  She and the defendant spent the day running errands.  Later that day, the victim and the defendant drove back to her sister's apartment.  The victim called her sister

---

[2] No actual court appearance had been scheduled.  The defendant indicated to the defense's expert witness, a forensic psychologist, that he intended to "speak with a clerk about reassessing the decision that had been made by the Housing Court sometime earlier."  The Commonwealth has characterized this as a "ruse" to lure the victim back to Massachusetts.

from outside, at approximately 9:27 P.M.  Her sister told her to come inside.  When the victim entered the apartment a few minutes later, she locked the door behind her.  The victim's sister observed that the victim appeared "somewhat calm, but nervous at the same time."  The victim sat with the rest of her family in the living room and spoke with them, while the defendant continued to wait outside.

Approximately one-half hour after the victim arrived, the defendant appeared at the front door to the apartment and shouted through the door that he wanted his cellular telephone (cell phone) back.[3]  When the victim's mother heard the defendant's voice, she quickly placed a chair against the door and sat on it.  The victim's sister told the defendant that he would get his cell phone back.  She called each of her neighbors in the building to help facilitate a transfer of the cell phone, but no one answered.  The defendant asked for his cell phone a second time, and the victim's sister again responded that he would get his cell phone back.  The victim's mother told the victim and her sister that they should call the police.  At some point, the victim's mother moved the chair away from the door.  Not long after, the defendant broke through the door with a two-

---

[3] There is no indication in the record whether, or why, the victim may have had the defendant's cellular telephone.

by-four piece of lumber taken from outside the apartment.[4] The victim's mother testified that the defendant said something to her, but she could not understand him. The defendant immediately hit the victim's sister over the head with the piece of lumber. He then grabbed the sister by the collar, but she managed to pull away. She staggered out of the apartment and went upstairs, screaming for help. The victim's four year old daughter followed her.

The defendant hit the victim over the head with the same piece of lumber he had used to hit her sister. The victim fell to the ground and was seemingly knocked unconscious. The defendant took out a knife that he had hidden in his sock. The victim's mother attempted to grab the knife, but cut herself when the defendant pulled away. The defendant bent down and stabbed the victim twenty-four times in the back, the chest, the head, the neck, and the left arm. During the attack, their one year old daughter was crawling between the defendant, the victim, and the victim's mother. After stabbing the victim, the defendant fled the scene and disposed of the murder weapon in a cemetery.

The victim's sister was able to reach one of her neighbors,

---

[4] The landlord had placed two-by-four pieces of lumber just outside the front door of the victim's sister's apartment in order to make repairs.

who telephoned the police. The victim was still alive when the police arrived, but died shortly thereafter. The defendant was subsequently arrested at his apartment. The arresting officers observed that the defendant appeared to be "under the influence of something." The defendant told the officers that he had "[taken] some pills." He was admitted to Union Hospital for treatment of a suicide attempt. The defendant was placed in the intensive care unit under police guard. A psychiatrist at the hospital, Dr. Maureen McGovern, performed a suicide risk evaluation on the defendant. He could not remember the night of the murder, but told the doctor that the victim "was the cause of all his problems" and that "he had thoughts about hurting her."[5]

At trial, the defendant did not contest that he killed the victim, but argued that he lacked criminal responsibility at the time of the murder. Defense counsel called an expert witness, a forensic psychologist, who had performed a psychological evaluation of the defendant. The expert diagnosed the defendant with bipolar disorder II, with "mixed characteristics of

---

[5] Dr. Maureen McGovern testified that the defendant said he had thoughts about "hurting" the victim. One of the police officers on guard in the defendant's hospital room testified that he overheard the defendant say he had thoughts about "killing" the victim.

depression and hypomania."[6]  The hypomania was exhibited by "restlessness" and "agitation," and the depression was exhibited by "subjective reports of depression . . . [and] difficulty sleeping."

The defense's expert witness testified that the defendant had been depressed, in part because he felt that the victim was keeping him from seeing their children.  The defendant indicated to the expert that he was having trouble sleeping in the days leading up to the murder.  He had also stopped taking his mood stabilizing medication because "he had been feeling good."

The expert testified that the defendant indicated his "spirits went up" on the day of the murder because the victim had indicated a willingness to stay with him for a period of time to "help to extricate him from the depression that he was experiencing."  This tentative plan would involve the victim going back to Delaware, gathering a few items for herself and the children, and returning to stay with the defendant.

The defense expert testified that, on the night of the murder, after waiting for the victim outside her sister's apartment for approximately ten to twenty minutes, the defendant

---

[6] The defense's expert witness defined hypomania as being a state with many of the same symptoms as mania, but lasting a shorter duration.  These symptoms include "a heightened sense of self-esteem, a lessened sense of the need for sleep, changeability in mood states, [and] agitation."

began thinking she was not coming back.  The defendant believed the victim's sister and mother would not allow him to go to Delaware with the victim.  He indicated to the psychologist that "his intent was to go down [to the sister's apartment] and get [the victim] so they could be on their way to Delaware."

The defendant explained to the psychologist that he was carrying a knife in his sock in order to kill himself.  He could not recall what happened after he reached the front door of the sister's apartment.  Given the defendant's inability to recall the murder itself, the defense expert was unable to reach a definitive conclusion as to whether the defendant lacked criminal responsibility at the time of the murder.  However, the expert testified that "[the defendant's] behaviors are consistent with an inability to conform his behavior to the requirements of the law."

The Commonwealth called its own expert witness on rebuttal, a forensic psychiatrist, who testified that he was not convinced that the defendant was bipolar, and did not believe that the defendant had a mental disease or defect at the time of the murder.  The Commonwealth's expert further stated, "There's nothing that, in my opinion, . . . resulted in the lack of substantial capacity to conform [the defendant's] conduct to requirements of the law."  He also indicated that individuals with bipolar disorder usually "don't have a pattern of violence

directed at others."

A jury convicted the defendant of murder in the first degree, home invasion, armed assault with intent to murder, assault and battery of the victim's sister by means of a dangerous weapon, and wanton and reckless endangerment of a child. He was acquitted of assault and battery of the victim's mother by means of a dangerous weapon.

2. <u>Discussion</u>. a. <u>Admission of statement to psychiatrist</u>. Prior to trial, the defendant sought to suppress statements he made to a psychiatrist after the murder. His motion to suppress was denied. On appeal, the defendant argues that the motion judge erred in denying his motion because the statements were (1) involuntary; (2) protected by the psychotherapist-patient privilege; and (3) obtained in violation of his due process rights. We address each argument in turn.

We summarize the motion judge's factual findings, supplemented by testimony from the hearing that was credited by the motion judge. See <u>Commonwealth</u> v. <u>Walker</u>, 466 Mass. 268, 270 (2013). See also <u>Commonwealth</u> v. <u>Jones-Pannell</u>, 472 Mass. 429, 431 (2015). On the night of the victim's murder, police went to the defendant's residence. Officers knocked on the defendant's apartment door and heard a large crash. The officers knocked on the door again and asked, "Are you all right?" The defendant answered "I can't walk." Officers heard

what sounded like someone falling, and entered the residence to find the defendant holding the door.  The defendant confirmed his identity to the officers.  He was on the floor with his legs tucked under him.  The motion judge found that the defendant "appeared intoxicated and had blood on his jean pants."  The officers placed the defendant in custody.  They asked the defendant if he had taken drugs, and he responded affirmatively. There were drugs and packets of Clonazepam in the area around the defendant.

The defendant was taken to Union Hospital.  He appeared to be conscious but under the influence.  He was placed in a single room in the intensive care unit and shackled to a hospital bed. The defendant's toxicity screens came back negative, but he had to be intubated because he was "lethargic to the point that he could not protect his own airways."

Two officers arrived at the hospital to secure the defendant and keep him under observation.  When they arrived, the defendant was lying down while somewhat propped up in the hospital bed.  The officers noticed that the defendant's eyes were closed at times.  They sat in chairs located inside the room, "past where the defendant was occupying the bed."  Various hospital personnel visited the defendant, and the defendant was able to respond appropriately to their questions.  At no point did the officers give the defendant Miranda warnings.

The physician who admitted the defendant asked an attending psychiatrist at the hospital, McGovern, to do a psychological consultation on the defendant.  McGovern spoke with the defendant more than twelve hours after his arrest and in the presence of the police officers.  During this conversation, McGovern was located on one side of the bed and the officers were seated on the other.  The officers did not, however, engage McGovern or the defendant in conversation.

McGovern asked the defendant medical questions, but did not give him Lamb warnings.[7]  See Commonwealth v. Lamb, 365 Mass. 265, 270 (1974).  His responses appeared to be appropriate to the questions asked.  The defendant did not slur his speech, appear injured, or complain of pain.  His vital signs were normal.  McGovern further observed that the defendant was quiet, subdued, calm, and cooperative.  She noted that the defendant had been medicated with a blood thinner and a medication to reduce stomach acidity.  Neither of these medications affected his mental state.  Although he appeared slightly drowsy, he was able to maintain attention throughout the thirty-minute interview with the psychiatrist.  McGovern believed that the

---

[7] In Commonwealth v. Lamb, 365 Mass. 265, 270 (1974), we held that when a psychotherapist conducts a court-ordered examination of a defendant, the psychotherapist must warn the defendant that the communications are not privileged.  We note that McGovern was not conducting a court-ordered examination. See Commonwealth v. Seabrooks, 433 Mass. 439, 450-451 (2001).

defendant was "cognitively intact"[8] and had a "thought process [that] appeared goal oriented."[9]  However, she was concerned about his emotional stability and worried that he might attempt suicide again.  She diagnosed him with depression, with elements of mania.

During her evaluation, McGovern asked the defendant if he wished to harm himself or others.  He indicated that he wanted to harm himself, and stated, "Since Friday, I was thinking I wanted to kill my girlfriend because she's the cause of my problems."

i.  Voluntariness.  First, the defendant argues that his statements to McGovern were not given voluntarily, because they were given as a result of the defendant's debilitated condition. We disagree.  The motion judge correctly found that the statements were voluntary.

"An admission by a defendant to a civilian is only admissible if voluntarily made."  Commonwealth v. Anderson, 445 Mass. 195, 204 (2005).  See Commonwealth v. Kolenovic, 478 Mass. 189, 198 (2017).  An admission is voluntary if it was "the

_____

[8] McGovern testified that "cognitively intact" means that the defendant did not appear to be delirious or demented. Rather, he appeared to understand where he was and "his general fund of knowledge was average."

[9] McGovern testified that "goal oriented" describes a thought process in which the patient understands the questions being asked of him or her and gives appropriate answers.

product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion." Commonwealth v. Harris, 468 Mass. 429, 434-435 (2014), quoting Commonwealth v. LeBlanc, 433 Mass. 549, 554 (2001). Courts evaluate voluntariness based on the totality of the circumstances. See Harris, supra at 435. See also Commonwealth v. Mello, 420 Mass. 375, 384 (1995). "Statements that are attributable in large measure to a defendant's debilitated condition, such as insanity . . . drug abuse or withdrawal symptoms, . . . [or] intoxication . . . are not the product of a rational intellect or free will and are involuntary." Commonwealth v. Allen, 395 Mass. 448, 455 (1985). See Commonwealth v. Bell, 473 Mass. 131, 141 (2015), cert. denied, 136 S. Ct. 2467 (2016).

Here, the motion judge found that the statements were made voluntarily because the defendant was "emotionally stable, cognitively intact, calm and cooperative, and not influenced by drugs or alcohol" during his conversation with McGovern. There was ample evidence to support the motion judge's conclusion. The defendant's toxicity screen was negative, the conversation took place over twelve hours after the defendant was arrested, and his speech was not slurred. Based on her conversation with the defendant, McGovern observed that he understood where he was and was able to understand the questions being asked of him and respond appropriately. See Commonwealth v. Brown, 449 Mass.

747, 767 (2007) (trial judge's finding that statement was voluntary was supported by testimony that defendant did not have trouble understanding questions his friends posed to him, and friends did not have trouble understanding his answers); LeBlanc, 433 Mass. at 555 ("Although the defendant was emotionally upset, he spoke calmly when giving his statement, and there is no evidence that he was acting irrationally"). While McGovern noted that the defendant's "insight and judgment [were] poor," this was based on his suicide attempt, not his responses to her questions.

Further, the defendant did not present any evidence indicating that his statements to McGovern were the result of threats, promises, or trickery. See Commonwealth v. Allen, 395 Mass. 448, 456 (1985). Nor were the police required to provide the defendant with Miranda warnings, as his statements were not made in response to a police interrogation and McGovern was not acting as an agent of the police. See id. 453-454. See also Commonwealth v. Trigones, 397 Mass. 633, 643 (1986). Accordingly, we discern no error in the motion judge's determination that the defendant's statements were made voluntarily.[10]

---

[10] Moreover, the trial judge gave the jury a humane practice instruction after the jury heard testimony about the defendant's statements to McGovern. The judge instructed the jury, in

ii. Psychotherapist-patient privilege. The defendant argues that his statements to McGovern were protected by the patient-psychotherapist privilege set forth in G. L. c. 233, § 20B. The statute provides: "[I]n any court proceeding . . . , a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition." The motion judge determined that because the defendant's statements were made in the presence of two police officers, the privilege did not attach or, to the extent it did, the defendant had waived it. We review for prejudicial error. See Commonwealth v. Dung Van Tran, 463 Mass. 8, 16 (2012). We conclude that the privilege did attach and was not waived by the presence of the police officers, but also that there was overwhelming evidence of the defendant's premeditation and any error in the admission of McGovern's testimony would not have been prejudicial.

A. Waiver. Under G. L. c. 233, § 20B, the psychotherapist-patient privilege attaches to any communications

relevant part, as follows: "[B]efore you can consider [the defendant's statement], the Commonwealth has to prove to you . . . beyond a reasonable doubt, that the defendant's statement was voluntarily made[,] that is, that it was made as a product of his own free will and rational intellect."

between a "patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition." In communicating with McGovern for the purpose of a suicide risk evaluation, the defendant met the statutory definition of "patient"[11] under § 20B, and McGovern, as a licensed, practicing psychiatrist, met the statutory definition of "psychotherapist."[12] The suicide risk evaluation was also specifically targeted at diagnosing and treating the defendant's "mental or emotional condition." Id. Thus, the defendant's communications with McGovern during the suicide risk evaluation met the statutory requirements for the psychotherapist-patient privilege to attach.[13]

---

[11] Under G. L. c. 233, § 20B, "patient" is defined as "a person who, during the course of diagnosis or treatment, communicates with a psychotherapist."

[12] Under G. L. c. 233, § 20B, "psychotherapist" is defined in relevant part as "a person licensed to practice medicine, who devotes a substantial portion of his time to the practice of psychiatry."

[13] The motion judge indicated that the psychotherapist-patient privilege requires a "confidential relationship" before it can attach. Although our prior cases have discussed the requirement that a "confidential relationship" exist between the patient and the psychotherapist, this was specifically in reference to the issue whether the person to whom the statement was made meets the statutory definition of "psychotherapist." See Commonwealth v. Mandeville, 386 Mass. 393, 409-410 (1982). A confidential relationship exists, such that the psychotherapist-patient privilege applies, whenever the statutory requirements of G. L. c. 233, § 20B, are met. See Robinson v. Commonwealth, 399 Mass. 131, 135 (1987);

The Commonwealth contends that that the privilege was nonetheless waived because the communications between the defendant and McGovern were made in the presence of the police officers guarding the defendant in the hospital. The statute contemplates that a patient may choose to waive the privilege. See G. L. c. 233, § 20B ("If a patient is incompetent to exercise or waive such privilege, a guardian shall be appointed to act in his behalf under this section" [emphasis added]). However, no explicit waiver occurred here. Thus, we must determine whether the presence of police officers constituted a waiver, absent the patient's affirmative consent to waive the privilege.

In interpreting the psychotherapist-patient privilege and the issue of waiver, we must look first to the text of the statute itself. See Commonwealth v. Vega, 449 Mass. 227, 230 (2007). See also Usen v. Usen, 359 Mass. 453, 457 (1971) ("We are not free to water down the legislative policy embodied in [G. L. c. 233, § 20B,] by loose construction or by giving our approval to informal procedures different from those prescribed"). The plain language of G. L. c. 233, § 20B, does not waive or restrict the availability of the privilege based on the presence of others or the particular location. To the

Commonwealth v. Clemons, 12 Mass. App. Ct. 580, 584 n.2 (1981). See also Mandeville, supra (adopting Clemons analysis).

contrary, the statute explicitly states that, "a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition" (emphasis added). Id. The language here is expansive, not restrictive, broadly protecting "the private interest that patients have in speaking freely during psychotherapy, and the public interest in encouraging troubled people to seek therapy." Conklin v. Feitelberg, 146 F. Supp. 3d 430, 437 (D. Mass. 2015), quoting Vanderbilt v. Chilmark, 174 F.R.D 225, 227 (D. Mass. 1997).

Unlike many other States that require the communication to be confidential or not intended for further disclosure, the Commonwealth has no such requirement in the text of G. L. c. 233, § 20B. Contrast Ala. Code § 34-26-2 (privilege applies to "confidential relations and communications"); Fla. Stat. § 90.503 (privilege applies to "confidential communications," defined as those not intended to be disclosed to third parties, other than those expressly permitted in statute); Or. Rev. Stat. § 40.230 (same); S.D. Codified Laws § 19-19-503 (same). Indeed, in Massachusetts the privilege applies to psychotherapist-patient communications, "regardless of the patient's awareness of such conversations, correspondence, actions and occurrences,

and any records, memoranda or notes of the foregoing." G. L. c. 233, § 20B. See Robinson v. Commonwealth, 399 Mass. 131, 135 (1987).

The expansive scope of the privilege is limited by six specific exceptions defining when the privilege is waived and disclosure is permitted. See G. L. c. 233, § 20B. None of these exceptions turns on the presence of a third party. We need not decide, however, whether the presence of a third party may still waive the privilege, as we conclude that the nature of the police presence here could not have done so.

Here, the police presence served essential public safety purposes. The defendant needed psychiatric services but also presented a grave danger to the public and hospital personnel. The police were deployed to guard the defendant and protect the public, including the hospital's medical personnel, and allow him to be treated despite those concerns. Given their public safety responsibilities, the police should not be required to leave the defendant's hospital room to allow the defendant to speak with a psychotherapist alone.[14] Nor should the psychotherapist be required to get so close to the defendant that only she and the defendant can hear one another.

_____

[14] This is true even if the defendant is shackled to the bed. The police and not the courts are in the best position to know whether the defendant remains dangerous even while shackled.

Psychotherapists should not be tasked with putting their own safety at risk in order to treat a dangerous patient.

In the absence of legislative direction to the contrary, we therefore conclude that police presence during a psychiatric consultation, which allows the defendant to receive necessary medical attention while protecting the public and medical personnel, does not waive the psychotherapist-patient privilege. Rather, allowing such consultations to go forward under police supervision, while leaving the privilege in place unless other exceptions providing for disclosure apply, properly balances both medical and public safety considerations. See State v. Deases, 518 N.W.2d 784, 788 (Iowa 1994) (doctor-patient privilege not waived by presence of third party if third party is present to assist doctor or presence is necessary to enable defendant to obtain treatment); People v. Sanders, 169 Misc. 2d 813, 819-820 (N.Y. Sup. Ct. 1996) (doctor-patient privilege not waived where police officer "was required to remain with the defendant at all times" and the defendant "did not have the option or ability to request a private session with the psychiatrist"). Cf. Secrest v. State, 679 A.2d 58, 62 (Del. 1996) (third-party waiver "makes sense in situations where the patient is reasonably lucid and able to control access to the setting"). Accordingly, we hold that a patient who has been placed under police guard does not automatically waive the

psychotherapist-patient privilege by speaking to a

psychotherapist in the presence of said police guard.[15,16]

_____

[15] Our holding is also in accordance with our case law on attorney-client privilege.  Attorney-client privilege is generally undermined by the presence of a third party.  See Commissioner of Revenue v. Comcast Corp., 453 Mass. 293, 306 (2009).  There is an exception to this general rule, however, when the presence of the third party is "necessary for the effective consultation between client and attorney" (quotations omitted).  Id. at 307, quoting United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961).  In order to be "necessary," the third-party presence must be "nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." Comcast Corp., supra.  In such instances, the privilege still attaches.  Id.

[16] Although it was error to find that the defendant had waived the psychotherapist-patient privilege, we note that the statement may very well have been admissible under G. L. c. 233, § 20B (c).  Subsection (c) provides that the psychotherapist-patient privilege will not apply

> "[i]n any proceeding, except one involving child custody, adoption or adoption consent, in which the patient introduces his mental or emotional condition as an element of his claim or defense, and the judge or presiding officer finds that it is more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected."

The defendant "introduce[d] his mental or emotional condition as an element of his claim or defense" by arguing at trial that he was not criminally responsible.  See Commonwealth v. Brandwein, 435 Mass. 623, 630 n.8 (2002).  The motion judge also could have found it "more important to the interests of justice" that the defendant's statements be admitted, particularly given that there was no ongoing patient-therapist relationship between the defendant and McGovern, and McGovern's evaluation was the only examination conducted around the time of the murder, rendering the evaluation important to the truth-seeking function of the court.  See Commonwealth v. Seabrooks, 433 Mass. 439, 448-450 (2001).  The defendant's apparent inability to recall the murder

B.  Prejudice.  Although the presence of the police officers did not waive the psychotherapist-patient privilege, we conclude that any error in the admission of McGovern's testimony would not have prejudiced the defendant because the evidence of the defendant's premeditation and criminal responsibility was overwhelming.  Perhaps most significantly, the defendant had repeatedly stated that "even if he killed [the victim's sister] or [the victim], nothing would happen to him because . . . he was bipolar."  He also made his intentions clear to the victim's mother months before the murder, stating, "When you get to Kenya, be prepared to receive two coffins, because I'm going to kill these daughters of yours.  And I'm starting with [the victim's sister].  [She] will not raise my children.  Instead, they'll be raised by the [S]tate."

On the night of the murder, he acted in conformance with this plan:  first attacking the victim's sister, and then attacking the victim.  Further, the defendant appeared to act normally up until the night of the killing, even running errands

_____

not only inhibited the jury's ability to evaluate his mental state but also interfered with defense counsel's own expert's ability to evaluate whether he lacked criminal responsibility. Insight into the defendant's mental state shortly after the crimes were committed would thus have been very helpful in evaluating his primary defense at trial.  The trial judge, however, would have had to make findings and weigh all the factors set out in Seabrooks, supra at 449-450, including whether the defendant consulted with counsel before speaking to McGovern, which he did not.

with the victim.  See Commonwealth v. Griffin, 475 Mass. 848, 856-857 (2016).  There was also compelling evidence that the attack was planned.  He brought the murder weapon with him, hidden in his sock, to the victim's sister's apartment.  When he stabbed the victim in a very small, narrow space, he did so carefully enough to avoid injuring their one year old daughter, who was crawling between the defendant and the victim. Moreover, the defendant's own expert testified that the defendant "certainly understood the wrongfulness of the [murder] immediately after the events," because he fled the crime scene and disposed of the murder weapon.  Given the substantial evidence of premeditation and criminal responsibility, the admission of the defendant's statement to McGovern about wanting to kill his girl friend did not prejudice the defendant.

iii.  Due process.  For the first time on appeal, the defendant argues that the admission of his statement to McGovern also violated his Federal and State due process rights because she did not provide him Lamb warnings indicating that the statement would not be confidential.  He cites two cases involving the Federal and State constitutional privileges against self-incrimination for this proposition.  "For the privileges [against self-incrimination] to attach, the State must compel the defendant to produce testimonial evidence." Commonwealth v. Seabrooks, 433 Mass. 439, 451 (2001).  As

previously discussed, the defendant's statement was voluntary and was not compelled. Further, Lamb warnings were not required, as the psychotherapist's questioning was not court-ordered or for the purposes of producing evidence against him. See Lamb, 365 Mass. at 270.

b. Jury instructions. The defendant argues that the trial judge, who was not the motion judge, erred in instructing the jury for four separate reasons. For the reasons discussed below, none of these arguments is persuasive.

i. Inference of sanity. On the issue of criminal responsibility, the trial judge in this case instructed the jury as follows: "[The Commonwealth has] to prove that the defendant was sane; that is, was criminally responsible. If you feel it appropriate you may take into account that the great majority of people are sane, and that there is a resulting likelihood that any particular person is sane." This instruction was given pursuant to our then-current case law, see Commonwealth v. Keita, 429 Mass. 843, 846 (1999) ("A jury instruction concerning the presumption of sanity should be given in every case in which the question of the defendant's criminal responsibility is raised"), as well as the Model Jury Instructions on Homicide in effect at the time. See Model Jury Instructions on Homicide 51 (1999). In Commonwealth v. Lawson, 475 Mass. 806, 814-815 & n.8 (2016), we held that, "given the meager weight of [the inference

that a defendant is probably sane because most people are sane]
and the risk of juror confusion regarding the burden of proof,
judges should not instruct juries regarding this inference."

"Here, the defendant is entitled to the benefit of Lawson,
as that case was released while the defendant's appeal was
pending on direct review." Commonwealth v. Muller, 477 Mass.
415, 431 (2017). As defense counsel objected to the sanity
presumption at trial, even though Lawson had not yet been
issued, we review for prejudicial error. See Commonwealth v.
Cole, 473 Mass. 317, 325 (2015).

In this case, the trial judge "strongly and specifically
instructed that the burden is on the Commonwealth to prove
criminal responsibility beyond a reasonable doubt."[17] Muller,

---

[17] Regarding the burden of proof on criminal responsibility,
the trial judge stated:

"[A]s to all of these charges, the Commonwealth also has to
prove to you that defendant did not lack criminal
responsibility. Remember the burden of proof is always on
the Commonwealth. The Commonwealth has to prove that the
person committed the crime charged, and that he was at the
time in such a mental state that he did not lack criminal
responsibility. If you're satisfied beyond a reasonable
doubt that the defendant committed the crime -- any of the
crimes that I have defined for you, you must decide whether
the Commonwealth has met an additional burden. The
Commonwealth also must prove that the defendant was
criminally responsible when he committed the crime
charged. . . . The Commonwealth must prove that the
defendant was criminally responsible beyond a reasonable
doubt. The burden is not on the defendant to prove a lack
of criminal responsibility. Instead, the burden is on the

477 Mass. at 431, quoting Commonwealth v. Griffin, 475 Mass. 848, 863 (2016). Further, as discussed above, there was overwhelming evidence of criminal responsibility. See Muller, supra, quoting Griffin, supra. Thus, the defendant was not prejudiced by any such error due to the overwhelming evidence of criminal responsibility and the trial judge's detailed instructions on the burden of proof for criminal responsibility. See Griffin, supra.

    ii. Consequences of not guilty verdict. The trial judge instructed the jury on the consequences of finding the defendant not guilty by reason of insanity, as permitted by Commonwealth v. Mutina, 366 Mass. 810, 823 & n.12 (1975) (Mutina instruction) and our Model Jury Instructions on Homicide in effect at the time of trial.[18] In Commonwealth v. Chappell, 473 Mass. 191,

---

Commonwealth to prove criminal responsibility beyond a reasonable doubt. Under the law, the Commonwealth bears the burden of proving beyond a reasonable doubt the defendant committed the crime or crimes with which he's charged, and also that the defendant is criminally responsible for his conduct."

[18] The trial judge instructed:

"[I]n in the event that the defendant is found not guilty by lack of criminal responsibility . . . , the District Attorney . . . may petition . . . for his commitment . . . if in that proceeding the Commonwealth proves beyond a reasonable doubt that the defendant is mentally ill at the present time, and that his discharge would create a likelihood of serious harm to himself or others. . . . [T]he order of commitment is thereafter periodically

205-206 (2015), we held that, going forward, Mutina instructions should "omit[] references to specific time frames for observation and mention[] the potential for successive commitment orders that could span the duration of the defendant's life." The defendant argues for the first time on appeal that the jury instructions created a substantial likelihood of a miscarriage of justice for failing to include the supplemental jury instructions from Chappell.

We have previously stated that it is not error for a judge to have given the Mutina instruction when it was the governing model jury instruction at the time of trial. See Commonwealth v. Dunn, 478 Mass. 125, 139 (2017). This is because we held in Chappell, 473 Mass. at 205, that the trial judge in that case did not err in providing the Mutina instruction. Rather, in Chappell, the Mutina instruction was changed prospectively to "better explain to the jury 'what protection they and their fellow citizens will have if they . . . arrive at a verdict of not guilty by reason of [lack of criminal responsibility].'" Dunn, supra, quoting Chappell, supra at 206. Thus, because the trial here took place before our decision in Chappell, the instruction was proper and did not create a substantial

reviewed[,] . . . [and] [i]f the Commonwealth fails to prove these matters beyond a reasonable doubt, the defendant is discharged."

likelihood of a miscarriage of justice.  See Commonwealth v.
Piantedosi, 478 Mass. 536, 550 (2017).

iii.  Reasonable doubt instruction.  The defendant claims
that the trial judge's instruction on reasonable doubt created a
substantial likelihood of a miscarriage of justice because it
"was identical to the instruction that this court criticized and
modified prospectively" in Commonwealth v. Russell, 470 Mass.
464, 477-478 (2015).  Here, the trial judge instructed:

> "Proof beyond a reasonable doubt does not mean proof beyond
> all possible doubt, for everything in the lives of the
> human beings is open to some possible or imaginary doubt.
> On the other hand, it is not enough for the Commonwealth to
> establish a probability, even a strong probability, that
> the defendant is more likely to be guilty than not
> guilty. . . .  [P]roof beyond a reasonable doubt is proof
> that leaves you firmly convinced of the defendant's guilt.
> There are very few things in this world that we know with
> absolute certainty, and in criminal cases the law does not
> require proof that overcomes every possible doubt.  If,
> based on your consideration of the evidence, you are firmly
> convinced that the defendant is guilty of the crime
> charged, you must find him guilty.  If, on the other hand,
> you think there is a real possibility that he is not
> guilty, you must give him the benefit of the doubt and find
> him not guilty."

Contrary to the defendant's assertion, the problematic language
in Russell was not used in the trial judge's instruction here.
See id. at 477 ("moral certainty" language required further
clarification).[19]  Further, the trial judge's instruction

_____

[19] We also stated in Commonwealth v. Russell, 470 Mass. 464,
479 (2015), that the new instruction provided therein was to

contains language we did not deem improper in Russell. See id. at 471-474 (rejecting argument that "firmly convinced" language lowered Commonwealth's burden of proof, or that "real possibility" language shifted burden of proof). Thus, the defendant's argument is without merit.

     iv. Additional instruction on criminal responsibility. For the first time on appeal, the defendant argues that the jury should have been instructed that his "failure to take his prescribed medication did not preclude a finding that he was not criminally responsible." The defendant asserts that because the jury were not provided with this instruction, there was a substantial likelihood of a miscarriage of justice. The defendant's argument assumes that, without such an instruction, the jury may have found him criminally responsible on the basis of his failure to take his prescribed medication. In support of his argument, he cites two prior cases involving instructions on voluntary alcohol or drug usage, Commonwealth v. Berry, 457 Mass. 602 (2010), and Commonwealth v. DiPadova, 460 Mass. 424 (2011).[20]

---

apply prospectively, not retroactively. See Commonwealth v. Rakes, 478 Mass. 22, 48 n.23 (2017).

     [20] Commonwealth v. Berry, 457 Mass. 602 (2010), and Commonwealth v. DiPadova, 460 Mass. 42 (2011), were decided after the defendant's trial, but while his case was pending on direct appellate review. Thus, we must still decide whether the

In Berry, 457 Mass. at 618, we set out new jury instructions for cases involving the interplay of drug or alcohol usage and lack of criminal responsibility:

> "Where a defendant has an active mental disease or defect that caused her to lose the substantial capacity to appreciate the wrongfulness of her conduct or the substantial capacity to conform her conduct to the requirements of the law, the defendant's consumption of alcohol or another drug cannot preclude the defense of lack of criminal responsibility."

We also stated that "[w]here the Commonwealth offers evidence that the defendant knew or had reason to know of the effects of drugs or alcohol on her latent mental disease or defect, or on the intensification of her active mental disease or defect," an additional instruction must be provided. Id. at 617 n.9.[21]

---

absence of the defendant's proposed instruction created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Johnston, 467 Mass. 674, 704 (2014).

[21] That instruction was as follows:

"However, if the Commonwealth has proved beyond a reasonable doubt that the defendant consumed drugs or alcohol knowing or having reason to know that the drugs or alcohol would activate a latent mental disease or intensify an active mental disease, causing her to lose the substantial capacity to appreciate the wrongfulness of her conduct or the substantial capacity to conform her conduct to the requirements of the law, then you would be warranted in finding the defendant criminally responsible for a crime in which you find she knowingly participated. In deciding what the defendant had reason to know about the consequences of her consumption of drugs or alcohol, you should consider the question solely from the defendant's point of view, including her mental capacity and her past experience with drugs or alcohol."

In DiPadova, we further stated:

"As in Berry, in this case, given the absence of a proper instruction, the jury could have misinterpreted the model instruction and concluded, erroneously, that even if the defendant's mental illness by itself caused him to lack substantial capacity, 'because [he] had consumed [drugs] that contributed to [his] incapacity, that would render the lack of criminal responsibility defense moot.'"

DiPadova, 460 Mass. at 435-436, quoting Berry, 457 Mass. at 618.

Unlike in Berry, there was also evidence in DiPadova, supra, that the defendant "knew at the time of the murder that drugs intensified the symptoms of his mental illness." DiPadova, supra at 436-437. We therefore clarified that the jury should have been instructed

"(1) if the defendant's mental illness did not reach the level of a lack of criminal responsibility until he consumed drugs, he was criminally responsible if he knew (or should have known) that the consumption would have the effect of intensifying or exacerbating his mental condition; and, in contrast, (2) if the defendant's mental illness did reach the level of lack of criminal responsibility even in the absence of his consumption of drugs, it was irrelevant whether he took drugs knowing that they would exacerbate that condition."

Id. at 437.

The concerns at issue in Berry and DiPadova are markedly different from the ones presented here. In each case, the jury received erroneous instructions regarding the interaction of mental illness and the voluntary consumption of alcohol or

Berry, 457 Mass. at 617 n.9.

drugs, which suggested that the consumption of the alcohol or drugs would negate a defense of lack of criminal responsibility. Here, the defendant does not identify any specific instruction as erroneous, such that it created juror confusion. Nor could he. As the trial judge remarked, "one thing I am not going to instruct [the jury] on is anything about the consumption of alcohol or substances. There's just no evidence of that. So I don't think this is an appropriate case for that." No instruction on the use of drugs, or lack thereof, was requested by either party, and none was given. Further, we discern nothing in the trial judge's instructions on criminal responsibility that would lead jurors to conclude that the defendant's failure to take his prescribed medication precluded the jury from finding him not criminally responsible. The instructions appropriately focused the jury on whether the defendant was criminally responsible at the time of the murder, not on the effect, if any, that the failure to take prescribed medicine could have on this determination. Cf. Commonwealth v. Shin, 86 Mass. App. Ct. 381, 388 (2014). Thus, the jury instructions in this case do not create the same potential for juror confusion as existed in Berry or DiPadova.[22]

---

[22] We further note that the failure to take prescription medication is not the same as the voluntary consumption of drugs or alcohol. See State v. Eager, 140 Haw. 167, 175 (2017).

Although defense counsel did refer to the defendant's failure to take his medication, stating in closing argument that "[u]nless properly treated and medicated the disease takes over, and that's what happened to [the defendant]," the Commonwealth never introduced evidence or argued at trial that the defendant was criminally responsible because he voluntarily chose not to take the medication that treated his mental illness. To the contrary, the Commonwealth primarily argued that the defendant's mental illness did not render him criminally irresponsible to begin with. The prosecution only referred to the defendant's failure to take his medication to express skepticism that it negatively affected his behavior. The prosecutor stated in her closing argument that "[i]t's a disease that waxes and wanes, that cycles over months, that even stopping his medications . . . would take days, weeks, or month[s] for the effect of that to be noticeable."[23] In these circumstances, where the defendant

---

There are many reasons why an individual may fail to take his or her prescribed medication. See Commonwealth v. Shin, 86 Mass. App. Ct. 381, 388 (2014) ("[M]entally ill people fail to take prescribed medication for a myriad of reasons, including, for example, side effects that may be otherwise dangerous to their health. . . . In addition, some people are unable to obtain the appropriate medication because of lack of money or access to medical care, or problems with necessary paperwork . . .").

[23] Further, the prosecutor had elicited testimony from the Commonwealth's expert that failure to take the defendant's mood stabilizing medication "would take weeks, months . . . to have an [e]ffect on this -- of the peaks and valleys [of the

argues for an instruction on a theory of criminal responsibility that was not presented at trial, we conclude that no such instruction was required.  Cf. Commonwealth v. Harris, 464 Mass. 425, 434-435 (2013) (no curative instruction required where, evaluating jury instructions as whole, no jury could have improperly concluded Commonwealth was relieved of burden of proof).

c.  Right to jury-waived trial.  The defendant requested a jury-waived trial, but his request was denied pursuant to G. L. c. 263, § 6, which does not provide defendants in a capital case the ability to waive their right to a jury trial.  The defendant asks that we find this statute unconstitutional, and in so doing, overturn our holding in Commonwealth v. Francis, 450 Mass. 132, 137 (2007) (concluding G. L. c. 263, § 6, does not violate defendants' equal protection or due process rights).  In support of this argument, the defendant asserts that jurors are biased against finding defendants not criminally responsible, and that jurors may have difficulty understanding instructions on criminal responsibility.  Much like in Francis, these

---

defendant's mood].  It's not like a diabetic going off instantly today and tomorrow near trouble with their blood sugar.  This is a chemical that kind of the brain is in over a long period of time.  It takes the peaks and the valleys off.  Helps some people.  But it -- sometimes even on [the medication], a person's going to rocket right through the high into a manic episode, manic psychosis, that requires hospitalization."

"arguments are policy matters suitable for legislative consideration," not judicial intervention.  Id.[24]

d.  Review under G. L. c. 278, § 33E.  We have reviewed the record pursuant to G. L. c. 278, § 33E, and discern no basis to set aside or reduce the verdict of murder in the first degree or to order a new trial.  Accordingly, we decline to exercise our authority.

Judgments affirmed.

---

[24] The defendant also notes that the third conviction of a habitual offender is considered a "capital case" for the purposes of G. L. c. 278, § 33E, see G. L. c. 279, § 25 (b), but is not considered a "capital case" under G. L. c. 263, § 6. Thus, "three-strike" habitual offenders are entitled to the same § 33E review as defendants convicted of murder in the first degree, but may still waive their right to a jury trial.  The defendant fails to expand on this argument, but presumably sees this as an equal protection violation.  As we stated in Commonwealth v. Francis, 450 Mass. 132, 135 (2007), "[i]t is reasonable for the Legislature to treat defendants facing a charge of murder in the first degree differently from other defendants."  Further, we acknowledged that there was a difference between the definition of "capital" under G. L. c. 278, § 33E, and that under G. L. c. 263, § 6, but rejected the argument that any such difference requires allowing defendants charged with murder in the first degree the ability to waive their right to a jury trial.  See Francis, supra at 137.  For substantially the same reasons stated in Francis, we discern no equal protection violation here.